PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al. FARMERS' LOAN & TRUST CO. v. METROPOLITAN ST. RY. CO. et al. (two cases). GUARANTY TRUST CO. OF NEW YORK v. METROPOLITAN ST. RY. CO. et al.

(District Court, S. D. New York. September 23, 1913.)

Equity 2—9, 2—23, 2—149, 3—37.

1. RECEIVERS (§ 158*)—DISTRIBUTION OF ASSETS—CLAIMS ENTITLED TO PREFERENCE—OPERATING SUPPLIES.

A court of equity, in the distribution of the assets of an insolvent railroad or street railroad company, has full power to accord priority to claims, for operating supplies furnished within a reasonable period and to a reasonable amount, over the claims of general creditors for construction or for rental, out of cash on hand at the beginning of the receivership, or the proceeds of quick assets which are unmortgaged; and, to warrant such preference, it is not necessary that the creditor should have known of and relied on the right when he furnished the supplies.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 301–306; Dec. Dig. § 158.*]

2. RECEIVERS (§ 158*)—DISTRIBUTION OF ASSETS—CLAIMS ENTITLED TO PREFERENCE—SUPPLIES.

The fact that an order appointing receivers for an insolvent street railroad company authorized them to pay claims for operating expenses incurred within four months does not deprive the court of the power, in its discretion, to award preference to claims for operating supplies furnished prior to such four months; and where current accounts for such supplies, furnished from time to time as required, down to the time of the receivership, include items for deliveries made a short time prior to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the four-month period, the preference may properly be extended to and include such items.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 301–306; Dec. Dig. § 158.*]

3. RECEIVERS (§ 158*)—DISTRIBUTION OF ASSETS—CLAIMS ENTITLED TO PREF-ERENCE.

In the distribution of the assets of an insolvent street railroad com-pany, claims for rentals of leased lines accruing prior to receivership are not entitled to priority of payment over general claims, as included in the class of claims for current operating expenses, to which a prefer-ence is given in equity.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 301–306; Dec. Dig. § 158.*]

4. RECEIVERS (§ 158*)—DISTRIBUTION OF ASSETS—CLAIMS ENTITLED TO PREF-ERENCE.

Tort claims for damages to individuals arising out of the operation of a street railroad system by a lessee *held* not entitled to priority over gen-eral claims, or over claims of the lessor for rentals in the distribution of the assets of the lessee in insolvency.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 301–306; Dec. Dig. § 158.*]

In Equity. This cause comes here upon exceptions to a report of William L. Turner, Special Master, filed by various parties in interest:

The order in this proceeding provides for the filing of type claims for pref-erence by claimants, whose claims have heretofore been allowed, or are pend-ing, against the New York City Railway Company, in the distribution of the assets of the estate of that company, and for the filing of similar claims for preference by the same claimants, and also by other claimants, whose claims have heretofore been allowed or are pending against the Metropolitan Street Railway Company in the distribution (1) of the assets of the estate of that company, or (2) out of the proceeds of the sale of any of its property, or (3) out of the income thereof, whether or not covered by mortgage or other lien. Discretion is given to hear and report on one or more claims so filed, as well as to allow to the claimant filing the distributive share payable out of either estate. Types of claims have been filed, and proof thereon taken accordingly, and they are intended to, and doubtless do, suggest all grounds of prefer-ence which may be urged by any claimant whose claim has been allowed or is pending against either estate. A reservation in the order protects claim-ants not filing preference demands whose claim comes within the type to which a preference may be accorded. A single report will be made, there-fore, on all claims for preference against both estates now dated, and the way will thus be cleared for a final determination by the court of the principles upon which the claims against both estates are to be disposed of. None of the claimants so filing asks that his distributive share be now reported on, for the reasons, doubtless, that claims duly filed against each estate and against the receivers are still in process of adjustment, and because the assets belonging to each estate have not yet been fully ascertained by the account-ing between the receiverships necessary for that purpose. It can be said, however, at this time that there is in possession of the receiver of the New York City Railway Company unmortgaged assets, consisting of cash on hand at the beginning of the receivership, materials and supplies of an ascertained value, for which the Metropolitan receivership has to account under the de-cree in the so-called "termination of lease" proceeding (198 Fed. 723, 117 C. C. A. 503), and its right to share under the decree in the apportionment pro-ceeding in assets recovered in the action at law and suit in equity therein apportioned, which are not subject to the demands of a particular class of creditors (198 Fed. 778, 117 C. C. A. 560). It has, in addition, its right to a share in the proceeds of the action at law under the latter decree for ex-

For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

penditures for construction purposes prior to the receivership, subject to the claims of construction creditors under the decision of the court in the Hugh Thomas claim, which is now before the Circuit Court of Appeals. The general assets of the Metropolitan estate, with the exception of the proceeds of sale of certain unpledged bonds, consist wholly of the amount allowed the Metropolitan Company, by such decree and the amount, if any, to be allowed on its claim against the City Company for damages for breach of the covenants in its lease to that company. Other assets are the proceeds of sale of its properties, subject to such equities as may exist against them.

In addition to claims for preference against the City estate, of which the four claims of supply creditors and the four claims of tort creditors suggest the types relied upon by such classes of creditors as entitling to a preference in the distribution of the City estate, 11 claims for preference against that estate were filed under the order, and exhaust all claims so filed against it. They are: Metropolitan stockholders, claim which has been withdrawn (198 F. 761, 117 C. C. A. 503); Central Crosstown claim (198 Fed. 756, 117 C. C. A. 503); Montague as receiver of Fulton Street Railway Company; Guaranty Trust Company, as trustee under the mortgage made by the Fulton Street Railway Company; receiver of the Metropolitan Company; Farmers' Loan & Trust Company as trustee, successor of Morton Trust Company; Central Park North and East River Company; Metropolitan Express Company (198 Fed. 735, 117 C. C. A. 503); National Conduit & Cable Company (198 Fed. 747, 117 C. C. A. 503); City of New York (191 F. 216); and New York Railways Company as holder of bonds of Metropolitan Street Railway Company.

The claims for preference filed against the Metropolitan estate find their types in the identical four claims of supply creditors above mentioned, and in three of the four claims of tort creditors so mentioned. In addition three other claims for preference are urged by tort creditors, of which one is asserted in the proceeds of the refunding foreclosure of the junior Metropolitan mortgage, and one in the proceeds of the Guaranty Trust Company foreclosure of its senior mortgage, both based on torts committed by the City Company, the third being based on a tort committed by the Metropolitan Company prior to its lease to the City Company. The other claims for preference against this estate are a construction supply claim and the claims of the Central Park North & East River Railroad Company, the Central Crosstown Company and the receiver of and trustee under the mortgage of the Fulton Street Railroad Company; these latter claims being for rent or payments in the nature of rent, and for waste arising out of breaches of its covenants in leases to the Metropolitan Company.

Except as to claims asserted by the four supply creditors to a preference in the distribution of the unmortgaged assets of the City Company it is clear that each and every other such claim above named must be denied. With reference to three of the claims for torts committed by the City Company prior to its receivership, suggested as types of claims entitled to a preference in such assets, it is sufficient to say that the court has said that they rank with general unsecured claims, and must be so classified. Penn. Steel Co. v. New York City Ry. (C. C.) 165 Fed. 457. Counsel for the tort creditors committee concedes this, reserving the contention for disposition by the Circuit Court of Appeals by appropriate exceptions. He does ask, however, that the fourth tort claim be accorded a preference over the Metropolitan receivers' claim against the city estate for breach of the Metropolitan city lease, and over so-called derivative claims based on the clause in such lease assuming liabilities of the Metropolitan Company under leases to it from the subsidiary companies above named, and all "subsequent" claims, which mean only the above-mentioned "Metropolitan Express" and "National Conduit" claims. This demand, it is said, is based on facts suggesting a legal conclusion not yet presented to the court for its decision, and it will be passed on after the disposition of the other questions suggested by the record has been indicated. It may be said of claims against the City estate other than the Metropolitan and the so-called derivative claims that the New York Railways Company, while stated on the record to be such, is not even a claimant for a preference, as it has filed no claim; that the claim of the city of New York for

preference has already been decided adversely to it by the court itself ([C. C.] 191 Fed. 216); that the National Conduit claim is based on an award of damages for breach of an executory contract to take cable, which was never delivered nor accepted before or after the receivership, and which did not contribute to the operation of the demised system of street surface roads in either period, and that it therefore does not come within the reason of the rule according preference to claims for supplies essential to operation; and that the Metropolitan Express Company claim, not being for such supplies, but for damages for failure to continue to accord to it the privilege of moving its freight over tracks and in cars furnished by the Metropolitan or City Companies, likewise fails to come within those rules, since a failure to furnish such facilities to this particular claimant did not of necessity tend to prevent their enjoyment by the public.

The remaining claims for preference against the City estate are claims of the Metropolitan receiver and the Farmers' Loan & Trust Company as successor to the Metropolitan mortgagee, the Morton Trust Company, for damages for waste and failure to make payments, such as taxes, arising under the Metropolitan City lease (both of which are regarded by counsel for these claimants as claims for rent), and the so-called derivative claims on behalf of the subsidiary companies, to wit, the Central Crosstown, the Fulton street and the Central Park companies for payments of taxes or interest which were undoubtedly rentals due from the Metropolitan Company under leases and contracts with it which the City Company became liable to pay by that lease. As counsel for the Metropolitan receiver insists that this claim is entitled to preference in payment out of any operating revenue of the City Company in the hands of its receiver as an operating claim pari passu with other such claims, and as such a principle also affects these claims of subsidiary companies, it may conveniently be disposed of in this connection, since supply creditors are insisting that it must be determined as a fact that a very considerable sum in the hands of the City receiver represents such operating revenue. The cases cited in support of the principle asserted are St. Louis R. R. Co. v. Cleveland R. Co., 125 U. S. 658, 8 Sup. Ct. 1011, 31 L. Ed. 832, Fordyce v. Omaha R. R. Co. (C. C.) 145 Fed. 544, Savannah R. Co. v. Jacksonville R. Co., 79 Fed. 35, 24 C. C. A. 437, and Manhattan Trust Co. v. Sioux City & N. R. Co. (C. C.) 102 Fed. 710. The cases cited in support of the opposite proposition that neither rentals nor taxes payable under leases accruing before receiverships may be preferred as current operation claims are: Thomas v. Car Co., 149 U. S. 95, 13 Sup. Ct. 824, 37 L. Ed. 663; St. Louis Merchants Bridge Terminal Co. v. Continental Trust Co., 111 Fed. 671, 49 C. C. A. 529; Gregg v. Trust Co., 109 Fed. 220, 48 C. C. A. 318; Louisville & Nashville R. R. Co. v. Central Trust Co., 87 Fed. 500, 31 C. C. A. 89; N. Y. P. & O. R. R. Co. v. N. Y. L. E. & H. R. I. Co. (C. C.) 58 Fed. 268. Support is, of course, to be found in the cases cited for each proposition. Mr. Justice Matthews' opinion in 125 U. S. 658, 8 Sup. Ct. 1011, 31 L. Ed. 832, does contain statements to that effect, but a careful reading of the opinion suggests that an assumption was there made which would not have been made if it had been vital, for the purpose of showing that it availed nothing—a familiar device in arguing. However that may be, they are not to be reconciled with the decision of the court in 149 U. S. (Thomas Case) by which Judge Lurton, in the Louisville & Nashville Case (87 Fed. 500, 31 C. C. A. 89), and the Gregg Case (109 Fed. 220, 48 C. C. A. 318), felt bound. In this later case, as here, lessee companies were bound to keep in repair, and to pay taxes, assessments, and rentals, but the court said that the forfeiture clause in the leases, present here as there, showed that the lessor did not rely upon its rentals as constituting an equitable charge upon the current income of the lessee company, and it further said that, "aside from this provision for its security, the very character of the claim prevents its inclusion among that class of claims for materials or supplies proper and reasonable for the current maintenance of the railroad as a going concern, in favor of which a special equity exists." I am referred to no case in this circuit covering this subject, and shall adopt this latter view in the recommendation to be made to the court. I do not, of course, think that the cases, of which Mercantile

Trust Co. v. F. L. & T. Co., 81 Fed. 254, 26 C. C. A. 383, is a type, that hold that rentals accruing under leases adopted by receivers during a receivership are part of operating expenses which must be deducted from gross operating revenues before anything accrues to the trust estate have any bearing on this question.

The remaining claims for preference against the City estate are suggested by the demands of the four supply claimants who also claim against the Metropolitan estate, and out of the proceeds of sale of any of its property or income, whether or not covered by mortgage or other lien, which latter demand necessarily affects the present New York Railways Company as purchaser on the foreclosure sale of the two Metropolitan mortgages, since it has agreed to pay any claims for which a preference is established against the corpus sold. These are claims of the Hugh Thomas Company, the Smith of New York Company, the Haggerty Refining Company, and the Berwind White Coal Mining Company, each based on contracts with the City Company. It will be necessary to describe them with some particularity.

The claim of the Hugh Thomas Company is for track sand used on the entire Metropolitan system as leased to the City Company. It was furnished between May 24, and September 24, 1907, the date of the appointment of the City receivers, its agreed value being $1,399.50. The purpose for which it was used was to sand the tracks so that the cars, in starting and stopping, might not slip. Additional sand or gravel delivered by the same company between such dates of a value of $869.09 was used for a different purpose, viz., as gravel for repairing in connection with the reconstruction of the First avenue line, and with the first amount makes the total of $2,268.59 allowed this claimant. It suggested the type of construction claim recently before the court, which has decided that it is payable out of a special fund for construction purposes represented in certain of the proceeds of the two actions, which were divided in the apportionment proceeding. As I read the briefs no contention is made that the construction claims of which this latter sand is a type have any preference over other claims in either estate, and of course to such claims the law accords no preference. Lackawanna Co. v. F. L. & T. Co., 176 U. S. 298, 20 Sup. Ct. 363, 44 L. Ed. 475.

The claim of the Smith of New York Company, allowed against the City Company for $117.25, is for lanterns used upon track work, burners, and wicks used in such lanterns, and globes, burners, and wicks used in lighting horse cars. These materials were furnished between September 14 and September 24, 1907, on two deliveries, one on September 14th and the other on September 24th; the goods delivered on the 14th being received at the general storeroom and placed in stock, and those on the 24th being received at the same place to be used for stock.

The Haggerty Refining Company's claim for preference is based on the claim allowed against the City Company for $1,920.85, for lubricating oil supplied for use in connection with the operation of the cars and power houses operated by the City Company. It was furnished in small quantities from time to time, in each month, from May 21, to and including September 11, 1907. A barrel of dynamo oil was furnished to the City Company at the Third avenue depot at Sixty-Sixth street and Third avenue on March 8, 1907, of the value of $9.18, which is included in this claim. A small part of this claim consists of kerosene and gasoline, and all of the material furnished was used in the operation of the Metropolitan system covered by the lease.

The claim of the Berwind White Coal Company, allowed against the City Company, for $110,540.74, is for coal delivered between the 30th day of March, 1907, and September 24th of that year. Coal of the value of $19,345.95 was day by day delivered to the Kingsbridge station, and of the value of $91,013.78 to the Ninety-Sixth street and First avenue power house by similar deliveries; it being stipulated that such deliveries were made for daily consumption into bunkers which held only two days' supply. The Ninety-Sixth street power house was owned by the Metropolitan Company and leased to the City Company, and it supplied power to the Metropolitan system and its subcompanies. The Kingsbridge power house was owned by the Third Avenue Company, leased to the City Company, and used as part of the

Metropolitan system. About 40 per cent. of the power developed at this latter station was transmitted directly, and charged at a fixed rate, to certain subcompanies of the Metropolitan and Third avenue systems, and the balance was turned in as alternating current on the various substations of the Metropolitan system, where it was indistinguishably intermingled in the generation of direct current for use in the operation of the Metropolitan system, including the Third and Amsterdam avenue lines with others.

Certain general contentions affecting the status of claims as supply claims, of which the foregoing are the types, which are urged by counsel for both receivers and the Mortgage Trust Companies, may be taken up before considering contentions respecting possible funds in which preference may be accorded. The first relates to the time within which such a claim must have accrued prior to the receivership, and is suggested by the barrel of oil above mentioned as delivered at the Third avenue depot on March 8, 1907, more than four months before the city receivers were appointed. It affects the claim of the Degnon Contracting Company, plaintiff in these suits, which is for snow removal in the early part of January and in February and March, 1907. The order appointing the city receivers contains a provision usual in this circuit, authorizing them "to pay and discharge all claims arising from the previous operation of said properties as in their judgment on examination are proper to be paid as expenses of operation and the current and unpaid pay rolls and vouchers incurred in the operation of said railroad system at any time within four months prior hereto." The power thus conferred was extended to the Metropolitan receivership by the order of October 1, 1907. In other jurisdictions three, and still others six, months are periods prescribed, and I agree with counsel for the Guaranty Trust Company that the insertion of such provisions is not to be regarded as the condition upon which such claims are allowed preference, or as an exercise of discretion, but as a recognition of a pre-existing right given without regard to such a discretion. The court will determine from all the circumstances whether a claim outside the period is equitably entitled to rank with those within it, as I think that the demand for the value of the barrel of oil here involved clearly should. The books are full of cases according claims accruing outside of the period prescribed rank with those within it. Some of them, with the date of accrual prior to the receivership, are these: Southern Railway v. Carnegie Steel Co., 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458, 8 to 11 months; Hale v. Frost, 99 U. S. 389, 25 L. Ed. 419, 33 months; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596, 11 months; Va. & Ala. Coal Co. v. Central R. R. & Banking Co. of Ga., 170 U. S. 355, 18 Sup. Ct. 657, 42 L. Ed. 1068, 8 months; Central Trust Co. v. St. Louis Ry. Co. (C. C.) 41 Fed. 551, 1 year; Farmers' Loan & T. Co. v. Kansas City Ry. Co. (C. C.) 53 Fed. 182, 18 months. Moreover when foreclosure follows an insolvency receivership, as some of these cases show, the time is not reckoned from the appointment of receivers in the foreclosure proceedings, but from the prior appointment. Of the many hundreds of thousands of dollars of claims of the types under examination which have been allowed against the City to date, it is to be noted that probably not more than $50,000 accrued prior to the beginning of this four-month period, and that these, like the claim of the barrel of oil, accrued within a very short time before that beginning, which was May 24, 1907.

The next contention is that the sale of materials and supplies must have been made upon the understanding, tacit or expressed, that current earnings would be appropriated to the payment therefor, and that they were for operating purposes. It is in effect urged that the burden is on the claimant of establishing this, and that this they have not done. The truth is, however, that where materials such as oil, coal, lamp wicks, lanterns, and sand are delivered to a railroad company on its order at such times, in such quantities and at such places as those here were, there can be but one inference, and that is not only that they were intended for operating purposes, but that they were ordered on the faith of the security that the law accords to claims for such materials so ordered, and delivered in the absence of anything to indicate a contrary intent. The case of the Southern Railway Co. v. Carnegie Steel Co., 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458, admits of no other

conclusion, and whatever expressions there may be in opinions in the cases cited in support of the proposition, that case must be accepted as establishing the rule which every federal court is bound to follow, and which, as here applied, is not in any way limited or qualified by the result reached in Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, but is on the contrary expressly recognized and reaffirmed. The Carnegie Case, it may be noted, decides, then, two matters: First that a claim for rails, ordered at times and in quantities which suggested an intention to use them for repairs as distinguished from construction work, fixed the creditor's status as an operating supply claimant, and without any express agreement to that effect, entitled it to assert an equity as such in current earnings *even though it accepted a note and a renewal of the note before the receivership;* and, second, that it made no difference that the rails purchased were used on the leased or controlled lines of the insolvent lessee. These propositions also answer in favor of the claimants any suggestion, based on the record, that the claim for coal transmuted into power sold to a controlled line, or for oil delivered to a leased line, or the lantern or sand that might possibly have been used in connection with construction work, deprives the claimant of status as an operating supply creditor. The record shows that the Metropolitan system devised was operated by the City Company as a unitary system, free transfers being given from lines of the system to each of the other lines, whether owned, leased, or controlled by the Metropolitan Company.

The final contention of a general nature affecting the supply claimant's status as an operating creditor is suggested by the sale to the City Company by the Smith Company of supplies on the day the receivers were appointed, which went into store and were then on hand. It is said that claims for materials on hand when receivers are appointed are not entitled to preference. It is sufficient to say as to this that the opinions in Virginia & Alabama Coal Co. v. Central R. & B. Co., 170 U. S. 355, 18 Sup. Ct. 657, 42 L. Ed. 1068, and the same case below sub nom Clark v. Central R. & B. Co., 66 Fed. 803, 14 C. C. A. 112, are to the contrary. There claims for supplies purchased by the lessor company, and on hand when receivers were appointed of a lessor road, and thereafter used by them, were accorded a preference. Claimants for supplies on hand when the City receivers were appointed, even though used by Metropolitan receivers, are therefore on the authority of this case and of the Southern Railway Case, 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458, operating supply creditors.

According, then, to the claimants, whose claims suggest the four types above described, the status of operating supply creditors, there is left for determination the funds in which the preference which the law gives them may be asserted. Among all the railroad receiverships involved in the numerous cases cited in the briefs the New York City receivership is unique in this respect: That there are no mortgage or other bonds outstanding, and that the receiver has in his possession a large amount of assets on which there are no liens, unless a lien attaches in favor of claimants such as these. These creditors assert in their own behalf and in behalf of similar creditors that they have an absolute and unqualified preference in these assets over all the other general creditors, the nature of whose claims has been indicated. This is vigorously denied, not only by the mortgage trustees under the Metropolitan mortgages, but by counsel for the receivers themselves, and they are able to point to one authority (Whelan v. Enterprise Transportation Co. [C. C.] 175 Fed. 212) which does hold that claims of operating supply creditors are to be preferred only over the vested liens of mortgage creditors, where operating income has been diverted for the benefit of the mortgaged property or its lienors, and not over general creditors at all. If it were not for this case I should have supposed that it had been asserted expressly or by implication in every case in the Supreme Court, from Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, to Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, that the court had full power to apply cash on hand at the beginning of a receivership or the proceeds of quick assets thereafter turned into cash in payment of such claims to the exclusion of general creditors for construction items or rental claims, and that such power was be-

yond question. That such is the view in this circuit has, I think, been determined in these very proceedings, in an opinion to which the attention of counsel is invited. When application was made to the court for leave to issue receiver's certificates, after pointing out that the necessity for the issue was due to the fact that the City Company had allowed the property to deteriorate, that its betterment, if confined to the properties covered by the two mortgages, would inure to the benefit of the mortgagees, and that the Metropolitan Company had a claim against the City Company under the lease for waste for such deterioration which is in the nature of rent. Judge Lacombe, in refusing the extension of the lien asked, said: "What the Metropolitan interests now ask is to make the lien of the certificates fall in the first instance on all property of the New York City Railway, and on all the earnings and income realized from the operation of the property by receivers since their appointment on the original creditors' bill against the lessee road. The natural result would be to give this claim for waste (i. e., against the City Company) a priority over all other claims, *even those of creditors for materials and supplies furnished within four months of receiver's appointment, a class of claim which is accorded priority in every federal jurisdiction.*" There is nothing in the modification which the Circuit Court of Appeals ordered, nor in its opinion, which in any way qualifies this statement of the law, and it is clearly a declaration that the supply creditors are preferred over unsecured claims for waste and those in the nature of rent which, apart from construction claims for which no preference is asserted, constituted by far the larger claims in amount against these assets.

In the Whelan Case Judge Lowell says in effect that it may seem anomalous that a claim superior to a mortgage debt is not preferred over general creditors, but that the priority rests on the duty of the mortgagee to contribute, and not upon priority in general distribution. In that case, in which the affairs of an insolvent steamship company were adjusted by the court, preference over general creditors was denied to a traffic balance due a connecting steamship line accruing prior to the receivership—a debt necessary to the business of the company, which even under the narrowed rule laid down in Gregg v. Metropolitan, 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, by a sharply divided court, is with claims for labor held entitled to go against the corpus without proof of diversion of current income for its benefit. It was a claim superior even to claims for supplies necessary to current operation, which emphasizes the anomaly. But surely the fact that by the slow process of judicial development there has been evolved a doctrine which displaces vested liens in favor of supply creditors does not mean that the duty which lienors may be under is exclusive, and that general creditors who have contracted solely on the personal credit of the company are in a superior position. It implies the contrary. It is impossible to read the cases cited in the prevailing and dissenting opinions in the Gregg Case without concluding that their necessary implication is that unmortgaged assets not only may, but must be, resorted to before any attempt by supply creditors to displace liens created long prior to their debts can be made. The reason for the preference lies in the necessity of fulfilling a duty to the public by keeping a railroad in operation, and that necessity is as present and as urgent in the case of the railroad company with a large unsecured indebtedness as in the case of a company whose property is wholly covered by liens. If the doctrine in the Whelan Case is to be applied to railroad receiverships, a court charged with a duty to the public of keeping the railroad of an insolvent company in operation might be wholly unable to discharge it, for it would be unable to use the cash and quick assets of the insolvent in payment of old and new debts for supplies, which are as essential to operation as labor itself. The opinion in the Whelan Case points to a possible distinction between a steamship and a railroad company receivership without deciding it. Since that decision the court in the same circuit has decided that supply creditors are preferred over general creditors and has done it in a steamship receivership, but without referring to the prior decision, and it has been affirmed on appeal. Berwind White Coal Co. v. Metropolitan Steamship Co. (C. C.) 183 Fed. 250; American Trust Co. v. Same, 190 Fed. 113, 111 C. C. A. 376.

The next contention of the supply claimants respecting City assets is that to the extent of their claims they are in any event preferred in such of the assets of the City Company as are attributable to income or earnings before the receivership. That they are so preferred as matter of law does not seem to be questioned by any one, but it is as vigorously denied on the one side as it is asserted on the other that the cash on hand at the beginning of the receivership, amounting to $683,898, can be attributed to operating receipts. The only other possible source is the advances from the Metropolitan Securities Company, and the undisputed evidence shows that these were intended for interest and rentals, among which I include taxes. Adopting the principle that such advances when intended prior to deposit for a particular purpose, though mingled with other funds, are, when withdrawals from the common funds are made for such purpose, to be deemed to have been applied to that purpose, I have no hesitation in concluding from Contract Claimant's Exhibits 119 to 124, taken in connection with the testimony of Mr. Warren, City Company's treasurer, and that of the auditors of the two receivers, that by no possibility can more than $21,898 of the said $683,898 of cash on hand be attributed to Security Company advances. The analyses of the accounts contained in the brief of counsel for the Berwind Coal Company, which it will not be necessary to summarize, is convincing as to this, and I do not understand from a careful reading of the briefs that it is disputed if the principle of tracing adopted is legally applicable. It is denied that it is so applicable; one contention being that all the assets in the hands of the City receiver must be regarded as the unexpended residue of the capital of the City Company. But the principle of tracing funds in bank accounts intended for a particular purpose is now firmly established (Knarchbull v. Hallett, 13 Ch. D. 696; Empire Surety Co. v. Carroll County, 194 Fed. 593, 114 C. C. A. 435; Board of Commissioners v. Strawn, 157 Fed. 49, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100; Importers' & Traders' National Bank v. Peters, 123 N. Y. 272, 25 N. E. 319. The equity in favor of supply creditors in earnings constitutes them a quasi trust fund; and, where it can be made to appear that assets of the insolvent are immediately derived from that source, any presumption that they are the unexpended residue of capital disappears as against operating supply creditors. In the St. Louis & Alton Case, 125 U. S., supra, under circumstances not unlike those here involved, the court points to advances made by the Pennsylvania and Ft. Wayne Companies, owners of the lessee's bonds, as a possible source of the payment of interest on the senior securities, and it did it for the purpose of indicating that earnings had not been used for that purpose.

The evidence in the case at bar goes much further, and shows why the advances made were borrowed, and indicates that they were used for the purposes intended. I conclude that of the cash on hand $662,000 was derived from earnings, and suggest a sum in which these four supply claimants have a superior equity.

Counsel for claimants point to a further possible fund to be added to this cash on hand, which on the evidence they say cannot be less than $621,689.10, which represents income expended for construction purposes between April 30th down to the receivership. I do not at this time determine that of the amount expended during this period for such purposes under article xv of the lease, which it is stipulated was $1,008,505.87, this sum of 600 odd thousands of dollars, was made from income, but I hold, on the authority of the Virginia & Alabama Coal Co. Case, 170 U. S., supra, that to the extent that any part of this stipulated sum may hereafter be determined to have been made from income, such part is to be regarded as income on hand at the date of the appointment of the city receivers when restoration has been made of these stipulated expenditures under the decree in the apportionment proceeding, in which operating supply creditors have a special equity. To the extent of such sum, if and when determined, the amount of cash derived from operation available for meeting preferred operating claims against the city estate will be increased accordingly.

The supply creditors point to still further funds which, unlike the foregoing, belong to the Metropolitan estate or its lienors, on which they claim

rights, and which suggest possible sources of payment in the event that they may not be entitled in funds indicated—a possible contingency which makes it necessary to consider them. It is to be regarded as established law that the equity of the supply creditor in income is a continuing one, attaching to net income earned after, as well as to income earned before, an insolvency receivership, even though followed by a receivership in foreclosure, and that such equity is in the nature of a right in rem and not in personam, which entitles him to follow this surplus or net income of the receiverships against all persons, including the lessor and its bondholders, who can be said to have been benefited by the diversion. This doctrine must, I think, be regarded as determined by the Virginia & Alabama Coal Company Case, 170 U. S. 355, 18 Sup. Ct. 657, 42 L. Ed. 1068, and reaffirmed and extended in the Southern Railway Case, 176 U. S., supra, and not qualified by anything decided in Gregg v. Metropolitan Trust Co., 197 U. S., supra. In the termination of lease proceeding (198 Fed. 723, 117 C. C. A. 503) it was decided that after September 24, 1907, the receivers were operating for the benefit of the Metropolitan estate and of its two mortgagees. Claimants insist on the strength of the receivers' accounts that during their period of operation from September 25, 1907, to December 31, 1911, sums were expended from surplus earnings for the betterment of the properties covered by the two mortgages, which constitute a diversion of that income in which claims for these supplies have a continuing equity, and which to the extent of the diversion must be restored out of the corpus. These accounts were admitted over the objection of the mortgage trustees and the purchaser on foreclosure that they are incompetent and hearsay, but I hold that the accounts of the receivers as officers of the court, appointed, as here, at the instance of the objecting trustees, are prima facie evidence of the facts therein stated, and even of such conclusions as that given expenditures were for betterments in favor of any party to the cause as against any other party. The opposite ruling would amount to a practical denial of justice. Objecting parties have, of course, the right to show that facts and conclusions from facts are otherwise, but it has been stipulated here that the question as to whether during this period there was a diversion of surplus earnings by the receivers to betterments shall be reserved. As to the question of law involved, which is not reserved, I hold again on the authority of the Virginia & Alabama Case (170 U. S., supra, and same case sub nom Clark v. Central R. & Banking Co., 66 Fed. 803, 14 C. C. A. 112), that if there were surplus earnings of the receivership devoted to betterments of the corpus of the mortgaged estates, restoration must be made to supply creditors who were such prior to the receivership out of such corpus to the extent of the diversion. I regard that case as determining that the contracts were made with the lessee railroad company, and that as they were for supplies for use on lines of the insolvent lessor road operated as a unitary system, whether owned, leased, or controlled, they suggest a continuing equity in income before the receivership and in surplus income after the receivership, and that diversions of such income either before or after for betterments must be restored from the corpus of properties of the lessor to the extent of the diversion. By mandate of the Circuit Court of Appeals (163 Fed. 242, 90 C. C. A. 188) receivers' certificates there authorized are a primary lien upon these surplus earnings, if such there be, and the court directs that of the funds named they shall be first applied to the redemption of the $3,500,000 of certificates authorized. As, however, the proceeds of those certificates were to be applied solely to the equipment and betterment of the properties covered by the lien of both mortgages, the redemption of the certificates will constitute a diversion of surplus income, if any, for the benefit of the corpus, which the bondholders or purchasers will be required to restore.

Further alleged diversions of income for the benefit of the two mortgaged estates which must, if from income, be restored from the corpus, are suggested by two payments of interest, one on August 30, 1907, within the four months' period of $312,500 on the general and collateral trust bonds of the Metropolitan, secured by the first mortgage to the Guaranty Trust Company, and the other just after the receivership of $332,080 on September 30, 1907, for interest on the refunding bonds secured by the second mortgage to the

Morton Trust Company. It will not be denied that even within the narrow rule laid down in the St. Louis & Alton Case, 125 U. S. 658, 8 Sup. Ct. 1011, 31 L. Ed. 832, which holds that payments out of income of interest on a senior mortgage do not benefit the estates of junior mortgages in such a sense as to require restoration from such estates to supply creditors, these payments benefited the estates of these Metropolitan mortgages, and must, if made from income, be restored from the corpus. It is denied that it can be said that they were made from income, but I think that it must be decided that the whole of the first payment, and at least $200,000 of the second, was made from that source. The first payment was made from banks in which only income receipts were deposited, and if I am right in supposing that moneys obtained from the Securities Company, the only other source of funds disbursed, are to be regarded as disbursed for the special purposes for which they were obtained, this payment was clearly made from income. Cash on hand on September 30th was all derived from income except a possible item of $125,000 from a controlled road (the Forty-Second street) for power furnished by the Metropolitan power houses, which might possibly be regarded as a restoration of income, but as it is deducted by claimant to avoid a question, it is not here considered. The conclusion that these payments were made from income results from the application of the principle adopted by Judge Lurton in Gregg v. Metropolitan Trust Co., 124 Fed. 721, 59 C. C. A. 637. There supply creditors were permitted to show that moneys derived from outside sources were used in the payment of general debts to rebut any inference, from the commingling of such funds in the common treasury with other company funds, that there had been a restoration of income diverted in favor of bondholders to betterments or interest payments. The argument made here that moneys, though deposited in several banks, from whatever source derived, are to be regarded as in a common treasury, was made in the case cited, and conceded, but supply creditors were, nevertheless, permitted to show the facts.

Claimants make the further contention that certain payments, within four months prior to the receivership, for interest on underlying bonds—by which is meant bonds of the constituent companies of the Metropolitan—and on bonds of its leased companies, as well as for rentals to its leased lines, were made out of income, and that, if so made, constitute diversions for the benefit of the general and refunding mortgagees, which must be restored· from the corpus of the property mortgaged to these latter. Of the interest and rentals thus paid, a certain amount is said to have been paid for rentals, $409,750, and interest, $112,500, on properties covered by both mortgages, the balance of $449,962 being for rentals on lines covered by the refunding or second mortgage only, a total of $914,212. That these amounts were paid from income rather than from the moneys borrowed from the Securities Company again rests on what I understood to be the fact that they were paid by checks on banks in which only income was deposited, Security Company moneys being deposited in still other banks for the special purposes for which they were used. Counsel for the mortgagees and purchaser, and of the receivers as well, insist that the St. Louis & Alton Case, 125 U. S. 658, 8 Sup. Ct. 1011, 31 L. Ed. 832, holds flatly that payments such as these do *not* constitute a diversion for the benefit of junior mortgagees, which these latter, or the purchaser, if he had agreed to, can be compelled to restore from the proceeds of foreclosure of their mortgages. This that case undoubtedly does decide. Claimants urge, however, that a different result was reached in Southern Railway Co. v. Carnegie Co., 176 U. S., supra. There the Carnegie Company sold rails to the Richmond & Danville for use on its congeries of owned, leased, and controlled lines for repairs, and they were used indifferently on such lines for that purpose. The contract of purchase was shortly followed by an insolvency receivership, which was extended in foreclosure proceedings to properties covered by a mortgage of the owning company junior to one other of the same company, as well as to mortgages of constituent companies and lessor companies, the final decree in which directed the purchaser to pay into court such sums as should be adjudged to be prior in equity to the mortgage foreclosed, which the Carnegie Company claimed the price of the rails

to be. Its claim was adjudged in accordance with its prayer. During both receiverships large sums were paid for rentals, interest, and dividends out of net earnings. That the Circuit Court of Appeals decided that these payments constituted diversions for the benefit of the mortgage foreclosed is clear beyond question (cf. 76 Fed. 492, 507, 22 C. C. A. 289). I do not understand that that is disputed. It seems clear that the Supreme Court approved, not only the conclusion of the court reviewed, but its reasons, based on the same facts that suggested it. After referring to payments of interest not only on underlying bonds, but on bonds of lessor roads payable as rent, the prevailing opinion states that such payments, with others specified, "were all for the benefit of mortgage creditors" (i. e., of the Danville Company), and that "it is a clear case of a diversion of income from the payment of current debts in the interest of mortgage creditors" (see 176 U. S. 294, 20 Sup. Ct. 347, 44 L. Ed. 458). In this Southern Railway Case the court clearly was impressed by the facts that the payments in question, which were of a nature precisely similar to those in the case at bar, were essential to the preservation of the unity of the system which, as here, was of vital importance to the mortgage bondholders, so that not only morally, but in the strictest legal sense, those bondholders were benefited by diversions of income for such a purpose. That the court referred to the St. Louis Case without disapproval does not alter the effect of what it said on the facts before it, which were such as to appeal strongly to its conscience, just as in the St. Louis Case the facts there involved were such as to control the conscience of the court and fully justify the conclusion that it reached. Careful reading of the opinion of Mr. Justice Matthews shows two facts which deprived the claim there considered of any merit. One was that the alleged diversion was in fact a possible payment out of borrowed moneys, and not out of income at all; the other was that the total rent paid the claimant lessor by the insolvent lessee under the peculiar reservations of the lease exceeded the total net earnings of the line from the inception of the lease. Expressions, arguendo, based on assumptions suggested by the claimant and adopted for the purpose of reducing the claim to an absurdity, should be considered in the light of such facts, and not as necessarily controlling in cases in which the facts suggest superior equities. That the majority of the court felt this as to the St. Louis Case is indicated by the fact that, while they cite it without disapproval, it is the sole basis for the directly opposite conclusion reached by the Chief Justice in his dissenting opinion. Accordingly I shall report to the court that these payments of interest and rentals, to the extent that they were made from income, should be restored from the corpus of the mortgaged estate, if it should be necessary to do so in order to pay these supply claimants in full.

The Pennsylvania Steel Company makes a further contention that supply creditors have a preference over claims, particularly of the Metropolitan Company in assets of the City estate on account of income diverted for interest and rentals. Though based on an equity on income, which it cannot be claimed that tort creditors possess, it results in a demand that to the extent of the payments from income of interest on lines owned or leased and of rentals on the latter which are treated as diversions for the benefit of the Metropolitan Company, supply creditors are entitled to be paid out of any distributive share in City assets to which the Metropolitan Company may be adjudged entitled by reason of breaches of covenants in its lease to the City Company, and is in effect the same demand as that made by tort creditors, to be presently disposed of, that the Metropolitan claim be deferred to theirs, though based on different and perhaps stronger grounds. It is admittedly an extension to lessors of the doctrine of restoration of diverted income as developed in respect to mortgages, its conceded novelty being attributed to the unusual fact that the insolvent lessee here is in possession of a large amount of unmortgaged assets. In view of the possible funds in which the preference accorded supply claimants may be asserted, it is not thought necessary to express an opinion concerning it, but as the record is in a shape to suggest it, it is here mentioned for the purpose of bringing it to the attention of the court.

Finally one general assertion in opposition to supply claims, based on the time of the diversion, may be disposed of. It is said that a diversion of in- come to mortgage creditors, in order to entitle a supply creditor to priority, must have been made after the creation of the supply debt; the cases cited being Central Trust Co. v. East Tenn. R. Co., 80 Fed. 624, 26 C. C. A. 30, Kansas Loan & Trust Co. v. El Revay (C. C.) 108 Fed. 702, and Fordyce v. Omaha R. Co. (C. C.) 145 Fed. 544. In the case first cited the claims accrued considerably more than six months prior to the receivership, after which there was no diversion, and in the record the master reported diversions for a period of nearly two years, the amount of which he was unable to tell. The third case follows the other two without discussion. While the facts of these cases may justify the conclusions there reached, it seems clear that the fair rule to follow as to claims accruing within a reasonable time before the receivership, such as a four or six months' period, is that suggested by Judge Lurton, though not perhaps speaking ex cathedra, on the point in Gregg v. Metropolitan Trust Co., 124 Fed. 721, 59 C. C. A. 637. Referring to a supply creditor who was within the six-month period the court said: "If his rights are to be dealt with separately and apart from other creditors of his class, he would have no standing, for there is no pretense of a diversion after his debt was made. We must also treat 'gross earnings' * * * as a single fund, and all debts made for current operating expenses during that time as equally payable out of that fund before any part of it is justly ap- plicable for other purposes." I agree with counsel for claimant that the ap- plication of the other rule to claimants within the period would put a pre- mium on slothfulness—for the longer the creditor left his claim unpaid the more likely would it be that diversions would occur and the less likely that the vigilant creditor could assert his equity.

The last question is the claim of the tort creditors that claims of the Metro- politan arising under its lease with the City Company, and possibly the so- called derivative claims of its lessors in the assets of the City estate, should be deferred to their demands, which is another way of asserting a preference over those claims. It is not at this time claimed, as has been said, to rest on any equity in income which tort creditors possess, but on an alleged control for a long time prior to the receiverships of the City Company by the Metro- politan, which is charged with diverting the income of the City Company by the exercise of such control to the payment of dividends not earned upon its stock, to say nothing of unearned rentals to lessors, and interest by way of rent on underlying bonds and the bonds of lessor companies leaving tort claims, which it is urged are in railroad practice regarded as operating claims, wholly unpaid. The assertion, however, that the Metropolitan Com- pany controlled the City Company is not strictly accurate. For considerably more than a year prior to the receivership the Interborough-Metropolitan Company controlled a very large majority of the share stock of the Metro- politan Company, and through its ownership of a controlling interest in the stock of the Security Company, which in turn owned all of the stock of the City Company, controlled that company too. The two companies were there- fore in a common ownership, and under a control which was manifested in an identity of directors and officials and of administration generally. In other words, as the Court of Appeals said on the appeal on the action at law, they were departments of one great corporate enterprise. There was, of course, a considerable minority interest in the stock of the Metropolitan Com- pany not subject to this control. The Circuit Court of Appeal has said in the "Invalidity Proceeding" (198 Fed. 767, 117 C. C. A. 503), respecting the lease between the two companies which it adjudged to be valid, and respecting con- tentions of the tort creditors which are in effect those urged here, that it perceived "no reasons urged in their behalf upon which the court could de- clare the lease invalid, nor the claims based thereon illegitimate." What we have then is a contention that the payment of claims arising under the lease which have been adjudged to be legitimate demands is to be regarded as fraudulent because lessor and lessee were under a common control, and that tort claimants have not been paid. It may be matter of regret that a legal basis cannot be found in statutes or decisions for the contention, but I

am unable to find one. Railway corporations are not controlled by the statutory rules applicable to other bankrupts, and the law in the absence of express provision does not make the payment of one lawful demand rather than another fraudulent as to the latter, even though the debtor be insolvent. And it is to be noted that dividends, though paid by the City Company direct to the Metropolitan stockholder under the lease, were strictly a rental payment, and, as the court has held, a legitimate demand.

The contract creditors will prepare a report in accordance with the foregoing, to which objections may be made and amendments proposed at a hearing on June 23, 1913, at 11 a. m.

O'Brien, Boardman & Platt, of New York City (George N. Hamlin, of New York City, of counsel), for John D. Crimmins et al., as a committee of contract creditors of N. Y. City Ry. Co.

Byrne & Cutcheon, of New York City (C. M. Travis, of New York City, of counsel), for Pennsylvania Steel Co. and Degnon Contracting Co.

Curtis, Mallet-Prevost & Colt, of New York City (F. Kingsbury Curtis, of New York City, of counsel), for Berwind White Coal Mining Co.

Charles Benner, of New York City (Benjamin S. Catchings, of New York City, of counsel), for committee of tort creditors of N. Y. City Ry. Co.

Harold C. Mitchell, of New York City, for J. P. Sjoberg Co.

Robert R. Howard, of New York City, for Atlantic Cement Co.

Parsons, Closson & McIlvaine, of New York City (Hiram Barney, of New York City, of counsel), for Eggleston Bros.

Johnson & Galston, of New York City (Clarence Galston, of New York City, of counsel), for National Conduit & Cable Co.

Page, Crawford & Tuska, of New York City (William H. Page and G. H. Crawford, both of New York City, of counsel), for Metropolitan Express Co.

Satterlee, Canfield & Stone, of New York City (K. T. Frederick, of New York City, of counsel), for Loraine Steel Co. and others.

John R. Abney, of New York City, for Mollie L. Latta, as administratrix.

Masten & Nichols, of New York City (Arthur H. Masten and William M. Chadbourne, both of New York City, of counsel), for Douglas Robinson, as receiver of Metropolitan Street Railway Co.

Dexter, Osborn & Fleming, of New York City (Matthew C. Fleming, of New York City, of counsel), for William W. Ladd, as receiver of New York City Railway.

Davies, Auerbach & Cornell, of New York City (Brainard Tolles and Charles H. Tuttle, both of New York City, of counsel), for Guaranty Trust Co. of New York and others.

Geller, Rolston & Horan, of New York City (Charles T. Payne, of New York City, of counsel), for Farmers' Loan & Trust Co., as trustee.

Choate & Larocque, of New York City (Gilbert H. Montague, of New York City, of counsel), for Gilbert H. Montague, as receiver of Fulton Street Railroad Co.

Richard Reid Rogers, of New York City (J. Tufton Mason, of New

York City, of counsel), for New York Railways Co. and Central Crosstown Railroad Co.

Strong & Mellen, of New York City (Chase Mellen of New York City, of counsel), for Central Park, North and East River Railroad Co.

Archibald Watson, of New York City, Corp. Counsel (Frank Pierce, of New York City, of counsel), for the city of New York.

Simpson, Thacher & Bartlett, of New York City (Graham Sumner, of New York City, of counsel), for John I. Waterbury and others, as a committee of stockholders Met. St. Ry. Co.

LACOMBE, Circuit Judge. The report so fully states the facts and the contention of the several parties, and its citation of authorities is so exhaustive, that it would needlessly incumber the record to do more than briefly state the conclusions reached here.

[1] The first claims to be considered are the four type claims, that of the Hugh Thomas Company and three others, referred to as operating supply claims. They are for materials and supplies, bought by the City Company, shortly before receivership, for use in operating the road. The objections urged to the master's findings that they were all of them in fact operating supply claims are unpersuasive, and the exceptions to those findings are overruled.

Claims of that character against bankrupt railroad companies have for years been accorded in the federal courts a special equity, which has entitled them to a certain priority of payment. Various theories for the creation of this special equity have been suggested, but the most satisfactory one finds its basis in public policy. A railroad is a peculiar sort of property; the public interest requires that its operations shall not cease. Whoever is undertaking to operate it, owner or lessee, must continue to do so, even at loss to itself, or the public will suffer. The operation may be so unprofitable, the operator may become so embarrassed, and its credit so impaired that it might not be able to purchase the supplies absolutely necessary for such continued operation on its own credit; dealers might be unwilling to part with their materials on the chance that the purchaser will manage in some way to pay for them before it fails. In order, then, that embarrassed railroad operators may be able to obtain the supplies necessary to keep the road running, the courts have held that persons who sell supplies of that character, for that purpose, in quantities not in excess of the requirements of the road for a brief period, shall be entitled to some security better than the personal obligation of a failing corporation. That security is found in priority of payment; the individual whose materials keep the road running for the last few weeks or months before bankruptcy has the first claim to what there may be found out of which payment can be made. Equities of a somewhat similar nature have been known to the admiralty law for a long time. In the case of a bankrupt railroad the courts have even, in some cases where the circumstances made it equitable to do so, allowed this special equity to displace the lien of a prior mortgage on the corpus of the property. Here, however, there is no question of any prior mortgage; none was ever made by the City Company, and all of its assets which

came into the hands of receivers were wholly unmortgaged. From a careful study of the authorities, it does not seem to this court that the peculiar and special circumstances which must be shown to justify according to an operating-supply claim a priority over the holder of a mortgage covering the property from which the claimant seeks payment need be shown when the latter asks to displace no prior lien, and to be paid only from unmortgaged assets. Practically all the authorities bearing on this question of priority in payment of supply claims are found in the master's opinion, and will be fully discussed, no doubt, upon appeal. To review them here would be a duplication. The master says:

"If it were not for this case (Whelan v. Enterprise Transportation Co. [C. C.] 175 Fed. 212), I should suppose that it had been asserted expressly or by implication in every case in the Supreme Court from Fosdick v. Schall, 99 U. S. 235 [25 L. Ed. 339], to Gregg v. Metropolitan Trust Co., 197 U. S. 183 [25 Sup. Ct. 415, 49 L. Ed. 717], that the court had full power to apply cash on hand at the beginning of a receivership or the proceeds of quick assets thereafter turned into cash in payment of such claims (for operating supplies within a reasonable period and to a reasonable amount) to the exclusion of general creditors for construction or for rental claims, and that such power was beyond question."

In this statement of the law, as deduced from the authorities, this court fully concurs.

It is contended that there should be affirmative proof, direct or circumstantial, as to each claim that the claimant did not rely on the personal credit of the purchasing company, but parted with his goods in the expectation that, in the event of failure, he would be paid for them out of the unmortgaged assets. Reference is made to Kneeland v. American Loan & Trust Co., 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379, where the claim was not for labor or supplies furnished for current operation. But, if the above quotation correctly expresses the law, such proof seems unnecessary. Every one is assumed to know the law, however ignorant he may really be of its provisions. That assumption has resulted in many cases of great hardship to the individual; there is no reason why it should not be applied when the result will give him a benefit. If as matter of public policy claims of this character are accorded a special equity, they should have it whether the vendor at the time of sale did or did not know that he was entitled to it.

[2] The conclusions of the master that all of these type claims are, under all the circumstances, within the time limitation approved by controlling authority are also concurred in.

Having reached the conclusion that these four type claims should be first paid out of the general unmortgaged assets of the City Company's estate in the hands of the court, the master quite properly made findings and conclusions as to the existence of certain specific funds, out of which on one theory or another, it was contended that they were entitled to priority in payment. It is not thought necessary to take up this branch of the case, for these reasons: When receivers were appointed the court came into possession of over $600.000 in cash and materials and supplies on hand, valued at over $1,150,000. The estate

of the City Company loaned the cash and sold the supplies to receivers to enable them to operate the system.  Receivers have also collected for the same estate, on bills receivable, insurance prepayments and similar items over $400,000.  The amount of credits resulting from the loan of the cash and the sale of the materials has been reduced by payments made on account of the City Company's estate by an amount concededly less than $600,000.  That estate, therefore, has about $1,-500,000 from these sources, and upwards of $2,000,000 as proceeds of a chose in action (the so-called "Equity Suit")—all of these assets are unmortgaged.  Since the total amount of all claims against the city estate of the kind represented by the four type claims is considerably less than $1,000,000, it is unnecessary to search for any fund from which to pay them other than these same unmortgaged assets.  Such an inquiry will become necessary only should the Court of Appeals reverse the holding of this court as to the special equity of such claims in these unmortgaged assets.  In order, however, that the whole case may be before the appellate court, all the findings and exceptions should be disposed of in some way; this can be done by a pro forma disposition of such of them as this court does not find it necessary to consider.  Such disposition will prejudice nobody, since it expresses no opinion as to the questions thus disposed of, and it makes no difference which interest appeals, as the expense of preparing the record will, as it has heretofore been, be borne by the estate.

[3] The next claims to be considered are for rent, dividends, and taxes covenanted to be paid under some lease or leases.  Prior decisions in this litigation classify all such claims as in substance for rental.  The court concurs in the master's conclusion that such claims are not of a character which admits of their inclusion among that class of claims for materials and supplies proper and reasonable for the current maintenance of a railroad as a going concern, in favor of which a special equity has been created by controlling decisions.

[4] The next claims are those for tort; that is, for damages resulting to individuals from the operation of the road before receivership.  It is contended that because such damages are the usual and natural result of running a railroad, they are to be considered as much an operating expense as are the various materials and supplies used in such operation.  The question of priority in payment of tort claims of this sort has been frequently before the courts; the decisions clearly indicate that they rank with general unsecured claims.  It may be that in some case, where shocking injustice would result from thus classifying them, a court of equity might be inclined to extend the rule as to operating-supply claims so as to cover them.  But that is not the situation here.  It has been repeatedly remarked that this receivership presents unique features, mainly because the road was operated by a lessee which issued no mortgage; the title to the corpus of the property—lands and buildings, tracks and equipment—remaining in the lessor with whom none of these claimants had any direct relations.  The supplies were sold to the City Company; the damages resulted from its operations; it, not the lessor, the owner of the corpus, was the one to respond therefor.  In the course of the litigation foreclosure suits

against the owner of the corpus were prosecuted to a final conclusion, and the property, as is usual in such cases, was sold for a sum which represented, not its value, but approximately the amount of securities held by the bidders. This proceeding is peculiar also in the circumstance that, at no expense to themselves, with no assessment laid against them, the holders of these tort claims were permitted and invited to come in and share in this acquisition of the corpus, to which their debtor had no title, on the same basis as the holders of first mortgage bonds. Out of $1,900,000 of such claims proved, $1,465,000 availed of this unique opportunity. Those of the claimants who neglected or rejected such opportunity seem hardly in a position to insist that new law should be made in this case, in order to classify them with operating supply claimants. The court concurs fully in the disposition made by the master of the contention made by the tort claimants that claims of the Metropolitan Company arising under its lease to the City Company should not be *deferred* in payment to the tort claims.

It is unnecessary to add anything to this concluding part of his opinion.

As to all other claimants for preference the decision of the special master is affirmed.

To the findings of fact numbered 3, 4, 5, 8, 9, 10, 12, 14, 15, 16, 17, 20, 21, 22, 23, 24, 25, and 59 to 81, both inclusive, no exceptions have been filed; they therefore stand confirmed.

The exceptions to findings numbered 6, 11, 18, 26, and 51 are overruled, and the findings confirmed.

The exception to the last paragraph of finding No. 19, touching a payment of interest on October 1, 1907, is sustained for the reason that it is not in accord with the opinion of the Court of Appeals in the so-called "Termination of Lease Proceeding."

Subsequent to September 24, 1907, no payments were made for interest out of the estate of the City Company. As already stated its cash on hand and cash collections were loaned, and its materials and supplies were sold to receivers; such loan will be repaid, and such materials paid for when accounting between the City estate and receivers determine the proper amount due.

The remaining exceptions to finding No. 19, and the exceptions to findings numbered 1, 2, 7, 13, 27 to 50, both inclusive, 52, 53, 54, 55, 56, 57, and 58, are pro forma overruled, and the findings confirmed.

The exceptions to the conclusion of law numbered I down to the end of subdivision (a) are overruled, and so much of the conclusion is confirmed. The exceptions to the remaining parts of the conclusion are pro forma overruled, and the conclusion confirmed.

The exceptions to conclusions of law numbered II and III and VI are pro forma overruled, and the conclusions confirmed.

The exceptions to conclusion of law numbered IV are overruled and the conclusion confirmed.

There being no exception to conclusion of law numbered V, the same stands confirmed.

As modified by this opinion, the report of the special master is confirmed.