## MOORE et al. v. DONAHOO et al.

(Circuit Court of Appeals, Ninth Circuit. September 14, 1914. On Petition for Rehearing, November 17, 1914.)

### No. 2353.

1. RECEIVERS (§ 158*) — PRIORITY OF LIENS AND MORTGAGES — DEBTS FOR OPERATING EXPENSES.

In the distribution of the assets of an insolvent railroad company, preference will not be given to debts for necessary operating expenses incurred before the receivership, over prior mortgages, from the corpus of the property, unless it is necessary to enable the receiver to continue operation of the road.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 301–306; Dec. Dig. § 156.*]

2. RECEIVERS (§ 158*)—PRIORITY OF LIENS AND MORTGAGES—DEBTS FOR OPERATING EXPENSES.

The right of persons furnishing labor or supplies necessary to the operation of a railroad to preference over a prior mortgage debt in case of insolvency, where such equity exists, is not dependent on the institution of the proceedings by the mortgagee, or the fact that the receiver was appointed at its instance, and that it thereby invoked the equitable powers of the court; but such right is one which the court may be called upon to affirmatively enforce.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 301–306; Dec. Dig. § 158.*]

3. RECEIVERS (§ 158*)—PREFERENCE OF DEBTS FOR OPERATING EXPENSES—DIVERSION OF INCOME.

Where there has been a diversion of income by a railroad company for the benefit of a mortgagee within the preferential period before a receivership, which should have been applied to the payment of current operating expenses, persons who furnished necessary labor or supplies during that time are entitled to have such income restored from the corpus of the property and applied to their claims, without reference to whether such claims became due before or after the diversion.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 301–306; Dec. Dig. § 158.*]

### On Petition for Rehearing.

4. RAILROADS (§ 194*) — SALE IN FORECLOSURE PROCEEDINGS — LIABILITY OF PURCHASER FOR INTEREST.

Where the property of an insolvent railroad company was sold under an order of court, subject to the payment by the purchaser, in addition to the sum bid, of such claims for operating and maintenance expenses incurred by the company prior to the receivership as the court should ultimately find entitled to priority over the mortgage debt, not exceeding a stated amount, the purchaser is liable for interest on the claims so awarded priority from the date of his purchase; the amount being in effect a part of the purchase price.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 643–655; Dec. Dig. § 194.*]

Appeal from the District Court of the United States for the Northern District of California; William C. Van Fleet, Judge.

Suit in equity by the Baldwin Locomotive Works against the Ocean Shore Railway Company and others. From a decree awarding preference to claims of F. L. Donahoo and others, Charles C. Moore, F. W.

Bradley, Maurice Schweitser, R. D. Robbins, and Walter S. Martin, interveners, appeal.   Modified.

Edward J. McCutchen, Gavin McNab, and A. Crawford Greene, all of San Francisco, Cal. (McCutchen, Olney & Willard, of San Francisco, Cal., of counsel), for appellants.

Goodfellow, Eells & Orrick, of San Francisco, Cal., for certain claimants.

Sullivan & Sullivan, Theo. J. Roche, and Goodfellow, Eells & Orrick, all of San Francisco, Cal., for certain labor claimants.

Charles S. Cushing and Wm. S. McKnight, both of San Francisco, Cal., for Remington Typewriter Co.

Frank M. Hultman, of San Francisco, Cal., for August Johnson.

Maurice R. Carey, of San Francisco, Cal., for R. P. Standley et al.

Daniel H. Knox, of San Francisco, Cal., for Knox and another.

A. F. Morrison, Peter F. Dunne, and W. I. Brobeck, all of San Francisco, Cal., for Mercantile Trust Co., of San Francisco.

Before GILBERT and ROSS, Circuit Judges, and DIETRICH, District Judge.

DIETRICH, District Judge.   The appellants represent the interests of the mortgagee, and the respondents are the unsecured creditors, of an insolvent railroad company.   The general question involved is when and to what extent the claims of those who in the ordinary course of business furnish labor and supplies for the maintenance and operation of a railroad will, in the distribution of its assets by a court of equity, be preferred to bonds secured by a pre-existing mortgage.

The facts are presented in the form of an agreed statement, accompanied by the decree of the lower court, as provided by general equity rule 77 (198 Fed. xli, 115 C. C. A. xli).   It is thereby shown that the Ocean Shore Railway Company was the owner of two short lines of railroad near the city of San Francisco, Cal., and on November 1, 1905, it executed a trust deed to the Mercantile Trust Company of San Francisco to secure the payment of an issue of bonds aggregating $5,-000,000, the deed covering all of its property, including future acquisitions and income.   Substantially all of the bonds were sold and became the valid obligations of the mortgagor.   No interest having been paid on account of the installments falling due upon November 1, 1909, and May 1, 1910, the trustee, acting in pursuance of the authority conferred upon it by the provisions of the mortgage or trust deed, declared the entire principal due, and upon June 7, 1910, caused notice to be published of its intention to sell the property for the purpose of paying the indebtedness.   The sale was originally set for September 1, 1910, but was postponed to October 1, 1910, and, under circumstances to be explained, was finally consummated on January 17, 1911.

In the meantime, on December 6, 1909, the Baldwin Locomotive Works, an unsecured creditor, filed a bill against the railway company as the sole defendant, in the United States District Court for the Northern District of California, in behalf of itself and of other creditors.   It was shown by the bill that the defendant was indebted upon

unsecured claims aggregating approximately $2,000,000, that it was insolvent, and that there was danger of its property becoming dissipated or impaired in value by the prosecution of numerous suits and the levy of attachments and executions. There was a prayer for the appointment of a receiver and for an order directing him to pay the claims of plaintiff and others out of the net operating revenues of the property. Upon the same day the railway company appeared, and by answer admitted the allegations of the bill and joined in the prayer for a receiver. One F. S. Stratton was thereupon appointed receiver, who at once took possession of the property and continued to operate it until February 1, 1911. On May 21, 1910, by supplemental bill, the Mercantile Trust Company was made a party defendant, together with numerous creditors who had intervened.

On July 22, 1910, upon the representation of the receiver that he could not operate the property without loss, the court entered an order, directed against all parties to the suit, including the trustee, requiring them to show cause why a sale should not be made by the receiver. In response thereto, the trust company, appearing "specially," asked that the order to show cause be discharged, and also filed a cross-bill setting forth its interest and praying that it be permitted to proceed with the sale without interference from the receiver. Hearings were had, and the court, having assumed jurisdiction to supervise and control the sale, entered an order authorizing the trust company to sell the property, under certain prescribed conditions, one of which was that out of the proceeds a specified sum should be turned over to the receiver for the payment of the expenses of the receivership and for other purposes, and another that the sale and transfer should be made subject to the payment of certain operating and maintenance claims against the railway company incurred before the appointment of the receiver, not exceeding in the aggregate $100,000, provided the court should ultimately hold that they were entitled to priority of payment over the bonds. The claims so referred to were those which the respondents now hold, but the character and amount of which had not at that time been judicially ascertained.

The sale was made in compliance with the terms of this order, and the appellants, who became the purchasers thereat, took the title subject to the conditions prescribed. It thus appears that the sale was made under the power of the trust deed, with the permission and subject to the conditions imposed by the court. In due time the trustee made return of its proceedings, and prayed for an order confirming the sale and directing the receiver to join with it in the execution of proper instruments of conveyance. Such an order was made, and conveyances were executed accordingly. Thereupon the purchasers sought and procured permission to intervene.

The question whether or not the respondents' claims should be paid in preference to the bonds was referred to a master. The master found (and the correctness of the finding is not questioned) that the claims which accrued during the period of six months immediately preceding the appointment of the receiver—that is, from June 1, 1909, to December 6, 1909—on account of labor done and materials furnished in the ordinary course of business, for the normal maintenance and opera-

tion of the railroad, and which it was reasonable to expect would be paid out of the current operating income, aggregated $48,571.42. It is agreed that the labor and supplies for which this indebtedness was incurred were in each instance necessary to the business of the railway company as a carrier of freight and passengers, and to the public service, and were necessary for the maintenance of the railroad, and to keep it a going concern. There was no current income on hand at the time the receiver was appointed, and the operation by the receiver was at a loss. Of the operating income accruing from June 1, 1909, to December 6, 1909, there was applied to the payment of expenses of construction and other obligations having no relation to the operation or maintenance of the road the aggregate sum of $30,000. There was no evidence as to the exact time when the diversion of any specific part of this sum was made.

The master held that all of the claims were preferential in character, but, adopting the "income" theory, limited the preference to the amount of the diverted income, and hence recommended a pro rata distribution of the $30,000 to the several respondents. While confirming the master's report in other respects, the court below took the view that, inasmuch as the indebtedness due the respondents was necessarily incurred in keeping the railroad a "going concern," the question of diversion was not controlling, and entered a decree adjudging the entire amount of $48,571.42 to be a first lien upon the property, and required the purchasers to pay the same, together with interest. The appeal is from this decree.

Conceding that under certain circumstances and within certain limitations the claim of a general creditor of an insolvent railroad corporation may be preferred to a pre-existing mortgage lien, appellants contend that the decree should be reversed or modified for the following reasons:

(1) The preference of the respondents, if any they have, is limited to the amount of income diverted, namely, $30,000.

(2) No one of the respondents is entitled to priority, because the trustee did not commence an action of foreclosure or secure the appointment of the receiver, or, as is claimed, submit itself to the operation of the rule that he who seeks equity must do equity.

(3) There is no proof that any current income was diverted during the six months period after the indebtedness of any one of the respondents had become payable.

[1] 1. As already intimated, the general question involved in the first proposition is whether we shall give place to what is known as the "net income" theory, or to the "going concern" theory, as the basis for preferential allowances. Are claims, such as those of the respondents are conceded to be, for current supplies and services which are necessary to the maintenance of the property of a public service corporation, and to keep it in operation, to be paid out of the current income in preference to the bonds, upon the assumption that the lien of the mortgage attaches only to the residue of the income remaining after the payment of the operating expenses, or may they displace the vested lien of the mortgage upon the corpus of the estate, because the claimants by their labor and supplies rendered necessary assistance in continuing the oper-

:ation of the property, thus enabling the debtor to discharge its obligations to the public?

In the court below, as we have seen, the latter view prevailed. The point urged by the appellants is, not that an incorrect application of the principle was made, but that the principle itself is inherently incorrect. The question has been the subject of frequent consideration in the federal courts, but the decisions are in hopeless conflict. Different rules have prevailed in the several circuits, and in some instances there has been an apparent lack of uniformity in the same circuit. Entertaining, as we do, the opinion that the point is conclusively ruled by Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, we do not deem it necessary to review or attempt to classify the numerous decisions cited in the briefs. This case was brought against the Columbus, Sandusky & Hocking Railroad Company for foreclosure of two mortgages, and a receiver was appointed. Within the six months period prior to the receivership, Gregg, in pursuance of the terms of a contract with the railroad company, furnished cross-ties for the replacing of ties decayed in the current operation of the road. A large proportion of the ties were on hand when the receiver was appointed, and used by him in maintaining the roadway. The circumstances indicated that payment would be made out of the current income. Furthermore, it was stipulated that the claim was for "necessary operating expenses in keeping and using said railroad and preserving said property in a fit and safe condition."

"The case stands," such is the language of Mr. Justice Holmes, speaking for the court, "as one in which there has been no diversion of income by which the mortgagees have profited, or otherwise, and the main question is the general one, whether in such a case a claim for necessary supplies furnished within six months before the receiver was appointed should be charged on the corpus of the fund. There are no special circumstances affecting the claim as a whole, and if it is charged on the corpus it can only be by laying down a general rule that such claims for supplies are entitled to precedence over a lien expressly created by a mortgage recorded before the contracts for supplies were made. An impression that such a general rule was to be deduced from the decisions of this court led to an evidently unwilling application of it in New England R. Co. v. Carnegie Steel Co., 75 Fed. 54, 58 [21 C. C. A. 219], and perhaps in other cases. But we are of opinion, for reasons that need no further statement (Kneeland v. American Loan & Trust Co., 136 U. S. 89, 97 [10 Sup. Ct. 950, 34 L. Ed. 379]), that the general rule is the other way, and has been recognized as being the other way by this court."

If by this language any doubt were possible of the intention of the court to disapprove of the "going concern" theory, the dissenting opinion most clearly indicates that it was this precise question upon which there was a division.

It is pointed out by respondents that their labor and supplies "were necessary to the business" of the road, while in the Gregg Case, after referring to certain allowances sanctioned in Miltenberger v. Logansport, etc., Railway Co., 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117, the following language is used:

"The ground of such allowance as was made was not merely that the supplies were necessary for the preservation of the road, but that the payment was necessary to the business of the road—a very different proposition."

Attention is also directed to that part of the opinion where it is observed that:

"The payment of the employés of the road is more certain to be necessary in order to keep it running than the payment of any other class of previously incurred debts."

And to the further statement that:

"We already have intimated that the payment of railroad hands might stand on stronger grounds than the payment for past supplies, etc."

But plainly all of these expressions have reference to the principle underlying an exceptional class of preferences considered in the Miltenberger Case. In brief, this principle is that a receiver may sometimes be authorized to pay past debts and charge the same against the corpus of the fund, where failure to make such payment would result in injury to, or would make it difficult to carry on the business of, the estate. If, for illustration, upon the appointment of a receiver, he finds that the pay of the enginemen of the railroad is in arrears, and that they are unwilling to render further service unless their claims are paid, the receiver may very readily conclude, especially where other skilled men are unavailable, that payment is necessary to the business of the road, and disbursements so made may be held to constitute a prior lien, upon the theory that they are required for the preservation of the value of the estate. So in the case where there is only one available source of fuel supply, and the owner declines to furnish the receiver with fuel until past bills are paid, a similar course may be taken for like reasons.

"It is easy to see," said the court in the Miltenberger Case, "that the payment of unpaid debts for operating expenses, accrued within 90 days, due by a railroad company suddenly deprived of the control of its property, due to operatives in its employ, whose cessation from work simultaneously is to be deprecated, in the interests both of the property and the public, and the payment of limited amounts due to other and connecting lines of road for materials and repairs and for unpaid ticket and freight balances, the outcome of indispensable business relations, where a stoppage of the continuance of such business relations would be a probable result, in case of nonpayment, the general consequence involving largely, also, the interests and accommodation of travel and traffic, may well place such payments in the category of payments to preserve the mortgaged property in a large sense, by maintaining the good will and integrity of the enterprise, and entitled them to be made a first lien."

In such cases the nature or character of the debts which the receiver is called upon to pay is comparatively unimportant; the controlling consideration is the present necessity of the receiver. If the exigency is such that he must pay past debts before he can procure indispensable future supplies, he must, in deference to his paramount duty to preserve the value of the estate, yield to the necessity, provided, of course, that the probable loss would exceed the required payments. It is to be noted that in the language above quoted from the Gregg Case a distinction is not drawn between supplies necessary for the *preservation* of the road and supplies necessary to the *business* of the road; it is difficult to see how, upon principle, such a distinction could be made. The ground of the allowance, says the court, was not merely "that the supplies were necessary," but that "the payment [therefor] was necessary."

The distinction is between the necessity of past supplies and the necessity of present payment therefor. Accordingly it was further said in the Gregg Case that:

"The payment of employés of the road is more certain to be necessary in order to keep it running than the payment of any other class of previously incurred debts."

Not that a different principle applies to labor claims, but that they are more likely to fall within the principle. In any case it is a question of business necessity, and such necessity is more likely to arise in the case of skilled labor than in the case of general supplies, which, if they cannot be procured from one source, may be gotten from another.

In the case at bar the receiver recognized this rule of necessity in the payment of a limited number of claims for rentals which are not here in controversy. But very clearly it was not made, and under the facts of the case it could not properly be made, the basis of the allowance of respondents' claims. So far as appears, the receiver never concluded that, as a matter of business policy, it was necessary to pay these claims, and no order was ever made directing or authorizing him to pay the same. There are no facts in the record from which it can be intelligently inferred that any one of the claimants continued to perform labor for or to furnish supplies to the receiver upon the condition or assumption that his claim would be paid. Indeed, there is no evidence that any one of the respondents was furnishing supplies or performing labor at the time the receiver was appointed, or thereafter furnished any supplies or performed any labor.

[2] 2. In response to the second proposition the reply may be made that, while the receiver was not appointed upon the application of the trustee, it did seek the aid of the court. True, it was formally empowered to enforce its security by notice and sale; but, without a decree adjudicating the rights of the numerous claimants, apparently no one would have purchased the property at such sale. This it practically conceded in the course of the hearings, and accordingly it filed a cross-bill, sought and procured judicial sanction for a sale, and upon its motion the sale was confirmed, and the receiver directed to join with it in executing conveyances to the property.

But, aside from these considerations, we are unable to yield to the view that claims of the character of those here involved can be preferred only in cases where the trustee institutes a foreclosure suit and applies for the appointment of a receiver. The principle of preference rests upon a more substantial basis than the power of the courts to deny an application for the appointment of a receiver in case the applicant is unwilling to submit to what the court may conceive to be equitable conditions. In the statement sometimes made that the court may, in the exercise of its discretion, deny relief to the mortgagee unless it is willing to recognize the equities of the unsecured creditor, there is clearly implied a pre-existing equity in the latter. As was pointed out in Kneeland v. American Loan & T. Co., 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379, the discretion is not to be exercised arbitrarily, but with due regard to contractual rights. And surely no equity as against a mortgagee or in favor of a general creditor arises

from the mere fact that the mortgagee may be under the necessity of invoking the aid of the courts to enforce his lien. The mortgagee's lien is such as by fair implication he has contracted for, and he cannot justly be required to barter a measure of his rights for a measure of the relief which it is the duty of the courts freely to accord to any one standing in need thereof. So with the unsecured claimant: Such equity as he may have flows from the fact that, in the ordinary course of business, he has performed labor or furnished necessary supplies to the railroad company with the reasonable expectation of being paid therefor from certain funds. His power to enforce his rights should not be made contingent upon the possibility that the secured creditor may apply to a court for the appointment of a receiver or for other equitable relief, a circumstance wholly fortuitous, or at least one over which he exercises no control.

The real basis upon which the preference rests is thought to be the implied understanding on the part of all parties that such debts are to be paid out of the current income before the mortgagee has any claim thereto. Reference to a few of the decisions of the Supreme Court will be sufficient to make this clear. In the leading case of Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, the court, speaking through Mr. Justice Waite, said:

"The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. If for the convenience of the moment something is taken from what may not improperly be called the current debt fund, and put into that which belongs to the mortgage creditors, it certainly is not inequitable for the court, when asked by the mortgagees to take possession of the future income and hold it for their benefit, to require as a condition of such an order that what is due from the earnings to the current debt shall be paid by the court from the future current receipts before anything derived from that source goes to the mortgagees. In this way the court will only do what, if a receiver should not be appointed, the company ought itself to do."

It is further said that:

It is within the power of the court to use the income of the receivership to discharge obligations which, but for the diversion of funds, would have been paid in the ordinary course of business. This, not because the creditors to whom such debts are due have in law a lien upon the mortgage property or the income, but because in a sense the officers of the company are trustees of the earnings for the benefit of the different classes of creditors and the stockholders; and if they give to one class of creditors that which properly belongs to another, the court may, upon an adjustment of the accounts, so use the income which comes into its own hands as, if practicable, to restore the parties to their original equitable rights."

It is also said that sometimes the court can require restoration of the diverted income from the corpus of the fund, the power so to do resting "upon the fact that in the administration of the affairs of the company the mortgage creditors have got possession of that which in equity belonged to the whole or a part of the general creditors."

In Burnham v. Bowen, 111 U. S. 776, 780, 783, 4 Sup. Ct. 675, 677, 679 (28 L. Ed. 596), it was said:

"The business of every railroad company is necessarily done more or less on credit, all parties understanding that current expenses are to be paid out of current earnings."

And again:

"If current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use."

To the same effect is St. Louis, Alton, etc., Railroad v. Cleveland, Columbus, etc., Railroad, 125 U. S. 658, 673, 8 Sup. Ct. 1011, 31 L. Ed. 832.

In the more recent case of Southern Railway v. Carnegie Steel Co., 176 U. S. 257, 285, 20 Sup. Ct. 347, 358 (44 L. Ed. 458), Mr. Justice Harlan, speaking for the court, said that, while each case must depend upon its own special facts, it could be safely deduced as a conclusion from the former decisions of the court:

"That a railroad mortgagee, when accepting his security, impliedly agrees that the current debts of a railroad company contracted in the ordinary course of its business shall be paid out of the current receipts before he has any claim upon such income."

If, as is thus held, the current income constitutes a trust fund, and if the mortgagee in taking his security impliedly agrees that laborers and materialmen may first be paid out of this fund, before he has any claim thereto, and if one performs labor or supplies material in reliance upon this understanding, it follows as a matter of course that he has a right which a court of equity may assist him to enforce, as well as to defend, and he may, if he so desires, initiate a proceeding for that purpose.

[3] 3. Under the third head appellants contend that a railroad company is under no obligation to provide for future indebtedness by the accumulation of a surplus, and that therefore a general creditor cannot complain of diversions of income prior to the maturity of his claim. The materiality of the contention lies in the fact that the record fails to disclose the relation of the several claims in point of time to the diversions relied upon. It is to be admitted that a measure of support for the general proposition may be found in the following decisions: St. Louis, A. & F. H. R. Co. v. Cleveland R. R. Co., 125 U. S. 658, 8 Sup. Ct. 1011, 31 L. Ed. 832; Central Trust Co. v. E. Tennessee R. Co., 80 Fed. 624, 26 C. C. A. 30; Kansas L. & T. Co. v. Electric Co., 108 Fed. 702; Fordyce v. Omaha, etc., R. Co., 145 Fed. (C. C.) 544, 555.

But here, as is the general rule, the courts must be understood as having spoken with reference to and in the light of the facts they had under consideration, and there is no very close analogy between some of the cases and the one at bar. In the first one cited, it may be pointed out that there was but a single intervention, and that the intervener sought to take advantage of diversions antedating the preferential period. While, as a matter of strict logic, these distinctions may

not be controlling, still it is apparent that the court had no reason to consider, and probably did not consider, the practicability or propriety of applying the rule relied upon to a case like the present one, where the diversions are all within the preferential period, and where the task of marshaling the numerous claims with reference to diversions, and calculating the distributive share to which each is entitled, would be extremely difficult, if not impossible. In the Central Trust Company Case there were but three interveners, and it is not clear that the diversion was within the preferential period. In each of the other cases there was but one intervention, and in at least one of them the diversion relied upon was prior to the six months period. It is also to be noted that the cases are not in harmony touching the date when the diversion period commences to run; two of them adopting the maturity of the creditor's claim, and the other two its creation. The appellants insist upon the former standard; that is, that there can be no diversion as to any creditor until his claim becomes due. In that view, if we suppose that employés upon monthly salaries, payable upon the 10th day of each succeeding month, render services to a corporation during a given month in expectation that they will be paid out of the current income, which they help to create, and upon the 1st day of the following month such income is applied to the payment of claims for betterments, and thereupon the mortgagee commences a suit in foreclosure and procures the appointment of a receiver, it is clear that the employés are left remediless. Again, under such a rule, what relief is available for those who supply materials or perform labor during the month immediately preceding a receivership, in a case where the current revenues for that month are applied to the satisfaction of similar claims accruing during the preceding month, which have remained unpaid because of the diversion of the current revenues for that month to the discharge of interest on bonds? And, generally speaking, it would inevitably result that claims most recently accruing, and therefore most clearly entitled to protection, would least often be in a position to demand a restoration of diverted funds. It is doubtless true in actual practice that credit is extended for current supplies and for labor upon the assumption that there has been no improvident diversion of the current income in the immediate past quite as often as upon the expectation that there will be no such diversion in the immediate future. Whatever standard may be employed in the case of an isolated claim in relation to an isolated diversion, it is thought that, at least in cases where the claims are numerous and the accounts current, the rule contended for would not only be difficult of application, but inequitable as well, and that some period must be adopted as a unit, during which all claims are to be deemed to constitute a single group and have the same footing. We agree with the court below in adopting the preferential period as such unit, and in holding that presumptively the current revenues thereof are applicable to the current debts, and that in case of a diversion restoration may be decreed for the common benefit of the entire group.

Accordingly the cause will be remanded, with directions to modify the decree by limiting its operation to the $30,000 fund, to which is to

be added interest at the rate of 7 per cent. per annum from the date the property was transferred to the appellants. Costs to appellants.

## On Petition for Rehearing.

[4] The principal contention made in the petition for rehearing is that the appellants ought not to be compelled to pay interest from the date the property was transferred to them. The propriety of such a requirement appeared to us to be so obvious that discussion of the point was not thought to be necessary in our original opinion. We are not unmindful of the general rule that, where property of an insolvent debtor passes into the hands of a receiver or an assignee in insolvency, interest is not ordinarily allowed to claimants to cover the delay incident to the settlement of the estate; but this rule is not applicable here. The order of sale was made, and the appellants purchased the property, and the transfer thereof was made to them, upon the condition and upon their implied agreement that they were to pay the aggregate of respondent's claims, up to $100,000, as a part of the purchase price. It is therefore not a question of penalizing them for the delay incident to the litigation, but rather a question whether or not they are to profit thereby. When they bought the property, in effect they agreed to pay, as the purchase price therefor, not only the amount which they have already paid, but also this $30,000. They have had the use of the $30,000, and the respondents, to whom it was presently due, have been deprived thereof. It is only fair and equitable that they should pay the value of such use.

Upon other points no new considerations are advanced. Accordingly the petition will be denied.