301 F.2d 847
 SOUTHERN RAILWAY COMPANY, etc., et al., Appellants,
v.
Seaborn J. FLOURNOY, Trustee, Appellee.
In the Matter of The ATLANTIC AND DANVILLE RAILWAY COMPANY,
Debtor. In Proceedings for the Reorganization of a Railroad.
 No. 8409.
 United States Court of Appeals Fourth Circuit.
 Argued Oct. 23, 1961.
Decided March 26, 1962.
 
 W. R. C. Cocke, Norfolk, Va., and Thomas B. Gay, Richmond, Va., for Southern Ry. Co.
 Russell T. Bradford, Norfolk, Va. (Denny, Valentine & Davenport, Richmond, Va., and Bradford & Guerry, Norfolk, Va., on brief), for Atlantic Coast Line R.R. Co. and Louisville and N.R. R. Co.
 T. Howard Spainhour, Norfolk, Va., for Texaco, Inc.
 Toy D. Savage, Jr., Norfolk, Va. (Thomas H. Willcox, Jr., and James Mann, Jr., Norfolk, Va., on brief), for National Bank of Commerce of Norfolk and Seaboard Citizens National Bank of Norfolk.
 Thomas R. McNamara, Norfolk, Va. (Williams, Cocke, Worrell & Kelly, Norfolk, Va., and Jos. L. Kelly, Jr., Norfolk, Va., on brief), for Norfolk and W. Ry. Co. and Pennsylvania Railroad Co.
 David M. Palley, New York City (L.S. Parsons, Jr., Norfolk, Va., on brief), for William Abrams, First Mortgage Bondholders and others similarly situated.
 Before SOPER, BOREMAN and BRYAN, Circuit Judges.
 ALBERT V. BRYAN, Circuit Judge.
 
 
 1
 Underlying mortgages of The Atlantic & Danville Railway Company-- debtor in this reorganization proceeding[1] -- on the one hand, and unsecured accounts with other railroads and a fuel supplier, on the other hand, her vie for primacy of claim upon A. & D.'s mortgaged properties.
 
 
 2
 Resolution of the contentions is required to evaluate the possibility of reorganization. As the assets are not sufficient to satisfy all claims, the trustee has reported the debts of the railway with recommendations of preference. Exceptions were taken to the report and the decree of the District Court thereon. The correctness of the amounts of the debts listed is not disputed. The contestants-- each maximizing its own realm of priority-- respectively charge encroachment upon the mortgage security and over-extension of the mortgage lien.
 
 
 3
 The open accounts before us are for items furnished by connecting lines and by a single retailer of locomotive fuel. Superiority is asserted on the basis that the bills represent 'business-operating' charges, that is, accounts for services, facilities and supplies absolutely necessary to the continued operation of A. & D. Admittedly the mortgages are valid, subsisting liens recorded long before incurrence of general creditors' claims.
 
 
 4
 The petition for reorganization was filed on January 19, 1960. At that time the railroad alleged its inability to meet its debts as they matured. Its financial condition proved to be roughly this: The first mortgage, dated July 1, 1949 and representing a refunded 3% debt, amounted to $2,007,800. Interest due thereon from July 1, 1949, to July 1, 1954 had been funded and deferred to July 1, 1999 by a supplemental indenture and amounted to $167,832. Subsequent interest in default since January 1, 1960 totalled $27,972. The second mortgage, also dated July 1, 1949 and evidencing a refunded 3% debt was in the sum of $1,143,750. Interest thereon from July 1, 1949 to July 1, 1954 aggregated $69,998 and had also been funded and deferred until July 1, 1999 by a supplemental indenture. Interest on the second mortgage was in default since January 1, 1960 and amounted to $11,666. Outstanding open accounts approximated $977,000. As of January 19, 1960 the railroad had cash in hand of only $49,146. Although the railroad has continued to operate since filing the petition, first under its own management and later under direction of the court trustee, its fiscal inadequacy continues.
 
 
 5
 It was suggested by one of the first mortgage bondholders that the railroad 'is hopelessly insolvent and cannot be reorganized'. He referred to the Trustee's Report No. 2 filed July 29, 1960 which averred that no plan of reorganization had been formulated though studies to that end would be assisted if submitted priorities could be ratified. The argument is that the railroad should at once be abandoned, and its assets sold and distributed to its creditors, implying also that at least consideration of priorities is premature and should await a decision of the preacticability of any reorganization.
 
 
 6
 Without weighing the merits of these assertions, the court is of the opinion that the question of priorities is neither premature nor moot. Nothing found in the Bankruptcy Act, 11 U.S.C.A. 1 et seq. or the Interstate Commerce Act, 49 U.S.C.A. 1 et seq. forbids ascertainment of the order of liens in advance of a plan. The trustee testified in the hearings following submission of Report No. 2 that he did not feel the railroad could be run as an independent line. He inclined to the view that it might be profitable as a division of a larger system. Regimenting the liens, we think, would be helpful to a consideration of this possibility as well as of any plan of reorganization later proposed. It would be of aid, too, in the event of sale of the railroad's properties.
 
 
 7
 The statute, 77 b, 11 U.S.C.A. 205(b), directs that determination of the several issues here be made upon principles employed in the administration of equity receiverships:
 
 
 8
 'For all purposes of this section unsecured claims, which would have been entitled to priority if a receiver in equity of the property of the debtor had been appointed by a Federal court on the day of the approval of the petition, shall be entitled to such priority and the holders of such claims shall be treated as a separate class or classes of creditors. * * *'
 
 
 9
 The expositive decisional law incorporated into the statute for fixing priorities as between general creditors and mortgages against the receivership properties lays down this fundamental principle: the mortgage is a paramount and exclusive lien upon the property therein conveyed as against a later unsecured or otherwise junior claim save for an exceptional and supreme equity. Kneeland v. American Loan & Trust Co., 136 U.S. 89, 97, 10 S.Ct. 950, 34 L.Ed. 379 (1890). The equity warranting deference of the mortgages to a general creditor must embrace the following elements:
 
 
 10
 (1) The account must cover an expense immediate to the continuance of railroad operation, not merely to its preservation: it must be a business-operating account; Virginia & Alabama Coal Co. v. Central R. & Banking Co., 170 U.S. 355, 368, 18 S.Ct. 657, 42 L.Ed. 1068 (1898);
 
 
 11
 (2) The account must have arisen within a reasonable time anterior to the institution of the trusteeship, generally established as 6 months; St. Louis & S.F.R. r. v. Spiller, 274 U.S. 304, 311, 47 S.Ct. 635, 74 L.Ed. 304 (1927);
 
 
 12
 (3) The Claim must represent a debt contracted with the intention of the parties that current earnings would respond thereto, not simply a charge upon the general credit of the road; Southern Ry. v. Carnegie Steel Co., 176 U.S. 257, 296, 20 S.Ct. 347, 44 L.Ed. 458 (1900);
 
 
 13
 (4) The account must first have been given preference in any current debt fund over non-operating debts and mortgage payments; Fosdick v. Schall, 99 U.S. 235, 254, 25 L.Ed. 339 (1878); and
 
 
 14
 (5) There must have been such a pressing necessity for payment of the account that it was reasonably probable that nonpayment would result in suspension of the railroad's operations. Gregg v. Metropolitan Trust Co., 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905); Miltenberger v. Logansport Ry., 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882); Moore v. Donahoo, 217 F. 177, 182 (9 Cir. 1914).
 
 
 15
 While this sovereign equity prevails also as between general creditor and general creditor, and between general creditor and mortgagee, in the disbursement of earnings, it is now discussed in the graver context of general creditor versus the corpus of the mortgage security.
 
 
 16
 In this connection it has been said that until the existence of earnings and other immediate funds for that purpose-- 'current debt fund'-- is ascertained, no ruling can be made on the issues before us. No such fund has been discovered and the mortgage trustees aver the complexities and expense of its determination would be prohibitive. Establishment of priorities is not thereby precluded, however. Regardless of who has the burden of proving the fund, we may proceed nevertheless in view of the conclusion we reach. If such funds later appear, they can be taken into account in settlement of general claims before resort is had to mortgage corpus.
 
 
 17
 The mortgagees-- trustees and bondholders-- concede concede the doctrine of priorities herein outlined only insofar as it governs priority among general creditors. They conceds it partial force, too, They concede it partial force, too, creditors; they insist that the latter's preference avails only to the extent a diversion of earnings-- from the general creditors for the benefit of the mortgagees-- can be demonstrated.
 
 
 18
 But we think income diversion to mortgage is not the sine qua non of corpus invasion where there are found-- as special circumstances-- all elements constituting the pre-eminent equity. Some precedents are to the contrary. Others, admittedly, expound the principle only by way of obiter, since in their facts prior diversion or receivership income was sufficient to render unnecessary direct expropriation of corpus to a general creditor. Throughout them, however, runs the acknowledgment that, in special circumstances as heretofore set out, the general creditor partakes of liened capital assets ahead of the mortgagee.
 
 
 19
 We deraign the surmounting equity previously noted from the opinions of the Supreme Court framing it, and interstitial decisions of lower courts further applying it, in absence of diversion. These cases develop the requisites of the priority whereby a business-operating general account overtops a mortgage lien. Initially, in Miltenberger v. Logansport Ry., supra, 106 U.S. at 311, 1 S.Ct. 162 the Court considered the payment of accounts for 'materials and repairs and for ticket and freight balances' owing by the debtor railroad to 'other and connecting lines.' Though they had been incurred more than 90 days previous to the date of the receivership, the District Court allowed the receiver to pay those accounts he deemed indispensable to his continued operation of the road and for nonpayment of which the road would 'suffer great detriment'. The Supreme Court approved payment of them before mortgage liens from the sale proceeds of the property, stating, 106 U.S. at 311, 1 S.Ct. at 162:
 
 
 20
 'Many circumstances may exist which may make it necessary * * * to pay preexisting dobts of certain classes, out of the earnings of the receivership, or even the corpus of the property, under the order of the court, with a priority of lien. Yet the discretion to do so should be exercised with very great care.'
 
 
 21
 The Court pitched its decision on the special circumstances of urgent necessity present, balancing both public and property interests.
 
 
 22
 The principle of necessity of payment has since been carried into different factual surroundings as the basis for granting superiority to business-operating accounts. Frequently Gregg v. Metropolitan Trust Co., supra, is cited as severely modifying the Miltenberger decision. In Gregg there was no diversion to benefit the mortgagees. A claim on open account for railroad ties delivered prior to the receivership was pressed against moneys arising from the mortgage foreclosure, there being no other fund for payment of current dobts. in denying the claim the Court stressed the cardinal rule of primeness the mortgage lien. While deploring the tendency of equity courts to allow trespass upon the mortgage corpus for open operational accounts, it intimated no intent to narrow Miltenberger. Noting that the Miltenberger accounts were not incurred simply for preservation but also for operation of the road, it pointed in chief to the special circumstances of compulsory payment of certain accounts to assure continued operation of the railroad as a going concern. On that basis the Court elucidated the thesis of Miltenberger. In our summary, necessity of payment is coupled as an inseparable concomitant to the other elements constituting the superordinate equity.
 
 
 23
 Chief Justice Fuller for this court in Finance Co. of Pennsylvania v. Charleston, C. & C.R.R., 62 F. 205 at 208 (4 Cir. 1894), early stated the broad principle of Miltenberger:
 
 
 24
 'It must be regarded as settled that a court of equity may make it a condition of the issue of an order for the appointment of a receiver of a railroad company that certain oustanding debts of the company shall be paid from the income that may be collected by the receiver, or from the proceeds of sale; that preferential payments may be directed * * * of limited amounts due to other and connecting lines of road for materials and repairs and for unpaid ticket and freight balances * * * and that such indebtedness may be given priority, notwithstanding that there may have been no diversion of income * * *.'
 
 
 25
 The theory that consent to the allowance of such claims is a condition precedent to equity's appointment of a receiver has since been discarded, but never the Miltenberger principle of priority. For even after Gregg this court reiterated in Virginia Passenger & Power Co. v. Lane Bros., 174 F. 513 at 516 (4 Cir. 1909):
 
 
 26
 'In a certain limited class of cases such preferential payments have been allowed out of the corpus * * *. One of the foundations of the principle is that the public interest requires that a railroad must be kept a 'going concern.' It does not depend, therefore, upon the diversion, or even upon the existence of income.'
 
 
 27
 This theorem is confirmed by decisions of other circuits, which similarly interpret and expand the application of the Miltenberger and Gregg cases, supra, as authorizing payment of such business-operating claims out of mortgage corpus in the special situation. E.g. Moore v. Donahoo, supra, 217 F. at 182: 'In brief, this principle is that a receiver may sometimes be authorized to pay past debts and charge the same against the corpus of the fund, where failure to make such payment would result in injury to, or would make it difficult to carry on the business of, the estate.'; Pennsylvania Steel Co. v. New York City Ry., 208 F. 168, at 182 (D.C.S.D.N.Y.1913), aff'd, 216 F. 458 (2 Cir. 1914): 'A railroad is a peculiar sort of property * * *. Whoever is undertaking to operate it * * * must continue to do so, even at loss to itself, or the public will suffer.' In Carbon Fuel Co. v. Chicago, C. & L.R.R., 202 F. 172 at 173 (7 Cir. 1912) the court declared:'The important question is whether an indebtedness of a railroad to supply claimants, incurred within six months of the appointment of a receiver, shall be paid out of the corpus of the estate in preference to the indebtedness to mortgage bondholders, when there has been no diversion of income and no surplus earnings, either before or after the appointment of the receiver.
 
 
 28
 'The extremely narrow limits within which this may be done are clearly defined (in the Miltenberger case as interpreted by the Supreme Court in Gregg). Not only must the indebtedness be a necessary operating expense in keeping and using the railroad and preserving the property in a fit and safe condition, not only must the supplies have been necessary for the business of the road, but the payment by the receiver of the indebtedness incurred before his appointment must be necessary to his continuance of the business of the road.'
 
 
 29
 See also Bowen v. Hockley, 71 F.2d 781, 784, 94 A.L.R. 856 (4 Cir. 1934); Chicago $ A.R.R. v. United States & Mexican Trust Co., 225 F. 940, 946 (8 Cir. 1915); Taylor v. Delaware & E.R.R., 213 F. 622, 624 (2 Cir. 1914).
 
 
 30
 As is apparent from Miltenberger forward, public concern with the continued operation of the railroad has been a factor supporting the priority accorded general creditors. This is accented by denial of such equity to corporations without public responsibility. See Wood v. Guarantee Trust Co., 128 U.S. 416, 421, 9 S.Ct. 131, 32 L.Ed. 472 (1888). Another reason is the conservation of the property for maintenance of the integrity and security of the mortgage: the bondholders presumably look for security to a live railroad. Lee v. Pennsylvania Traction Co., 105 F. 405, 407 (C.C.E.D.Pa.1900). Both of these concepts must at times regard costs of operation as the price of security. Mortgagees must then yield priority.
 
 
 31
 As stated, the accumulation of preferred general accounts is limited. The period is by some fixed as a time reasonable for railroad and creditor to settle and adjust accrued unpaid bills for business-operating expenses. Southern Ry. v. Carnegie Steel Co., supra, 176 U.S. at 292, 20 S.Ct. 347. Also suggested is the time representing the period beyond which the mortgagees may not reasonably be expected to tolerate continued default of the railroad. Pettibone-Mulliken Co. v. Guaranty Trust Co., 25 F.2d 948, 950 (8 Cir. 1928). The limitation, therefore, is the result of a balancing of interests: operating creditors must be indemnified for maintenance of the mortgagee's security in alost railroad, yet such general creditors should not be permitted, under guise of maintaining the security, to undermine the mortgages 'through secret liens'. Westinghouse Air Brake Co. v. Kansas City So. Ry., 137 F. 26, 40 (8 Cir. 1905). Generally the limitation is the six months preceding initiation of the receivership proceedings. St. Louis & S.F.R.R. v. Spiller, supra, 274 U.S. at 311, 47 S.Ct. at 637; Dictaphone Sales Corp. v. Powell, 77 F.2d 795, 797 (4 Cir. 1935); Continental Trust Co. v. W. .R Bonsal & Co., 72 F.2d 975, 980 (4 Cir. 1934), cert. denied 292 U.S. 624, 55 S.Ct. 239, 79 L.Ed. 711 (1934).
 
 
 32
 Nothing unique lifts the claims now on appeal out of the six-month category-- from July 19, 1959 to January 19, 1960. But we think all save one meet every criteria comprising the sovereign equity. The exception to be noted is the claim of Texaco Inc. for fuel oil.
 
 
 33
 1. Traffic Balances. A. & D. runs between Danville, Virginia on the west and Portsmouth to the east. It hauls over its rails traffic destined to and from points beyond its termini. Thus it must account to many lines for transportation charges collected on interline haulage. For balances arising in this way, appellants Southern Railway, Atlantic Coast Line Railroad, Norfolk and Western Railway, Pennsylvania Railroad and Louisville & Nashville Railroad urge priority for their payment over the mortgage liens.
 
 
 34
 Their accounts were incurred within the six months immediately before January 19, 1960. Interline charges are, of course, contained in current revenues. Neither practically nor legally could A. & D. or other carriers have refused the joint hauls giving rise to these balances. Such transportation is art and part of our national railroad system. Indeed, it is compelled by statute. 49 U.S.C.A. 1 et seq.
 
 
 35
 While other carriers were obligated to interchange freight with A. & D., they could not be forced to do so without prepayment or giving security for payment of the transportation charges. The Interstate Commerce Act does not override common law rights of carriers save insofar as it does so expressly, and we find nothing prohibiting-- after due notification of an intention to do so-- demand upon a delinquent carrier for payment of transportation charges before accepting or releasing consignments. 49 U.S.C.A. 22; 49 U.S.C.A. 3(4). We cannot conceive of any such forbiddance by the Interstate Commerce Commission. Little Rock & M.R.R. v. St. Louis S.W. Ry., 63 F. 775 (8 Cir., 1894); Dobie, Bailments and Carriers 460 (1914 ed.). A. & D's history shows it could not possibly have posted advance payments or made 'junction settlements'. That other lines could then have refused traffic coming to and from A. & D. constitutes an immediate necessity of payment threatening the debtor.
 
 
 36
 With the District Court we agree that interline accounts are an equitable lien on the railroad properties and outrank the mortgages.
 
 
 37
 2. Atlantic Coast Line Railroad. Aside from its interline account balance, Coast Line asserts a claim under a supplemented agreement dated July 1, 1949 with A. & D. This contract granted A. & D. trackage rights over the rails of Coast Line between Boone and Pinners Point, which is across the Elizabeth River from Norfolk, Virginia. It further provided services and facilities at Coast Line's Pinners Point terminal. Acquisition of these rights was a condition precedent to consent of the Commission to establishment of A. & D. as an operating railroad. Previously A. & D. was solely a lessor line, having demised all of its holdings to the Southern Railway.
 
 
 38
 For the six months preceding the reorganization petition, we think amounts earned by Coast Line under this agreement should be accorded priority over the mortgage liens. The rights, services and facilities obtained by A. & D. under the agreement were indispensable to its operation, so essential, in fact, that without them the road could not run.
 
 
 39
 Necessity of payment is here conspicuous. While the agreement contained no provision for termination on nonpayment of the compensation reserved, failure of A. & D. to make the monthly payments-- charged at the rate of $4.00 for each car using the terminal facilities plus incidental expenses-- would be a breach of a major term of the agreement. Such payments were required 'promptly and within 30 days after the receipt' of a bill to be rendered on the 20th day of each month. Manifestly, after due warning Coast Line would be permitted by the Commission to end the contract for such breach.
 
 
 40
 Prior to July 1959 default of A. & D. in payment under this agreement exceeded $150,000 and at times reached as much as $200,000. Payments had been praetermitted for considerable periods. Of course, having allowed this large balance to accrue and credit to extend therefor from time to time, the right of Coast Line to terminate the agreement for nonpayment of the arrearage is dubious. But this does not mean credit could not be discontinued for the future. Nonpayment of accruals for any month within the six-month period would have afforded reasonable grounds for a successful application by Coast Line to the Commission to terminate the agreement. This was a constant threat-- a pressing necessity of payment. Crediting of recent payments to old balances did not lessen the prerogatives of Coast Line under the agreement.
 
 
 41
 Again, these payments were not rentals for supplementary track or car use such as were before the courts in Thomas v. Western Car Co., 149 U.S. 95, 13 S.Ct. 824, 37 L.Ed. 663 (1893); Pullman's Palace-Car Co. v. American Loan & Trust Co., 84 F. 18 (8 Cir. 1897); or in Kneeland v. American Loan Co., supra, 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379. The trackage, terminal rights and other facilities assured by the instant agreement were of the very skeletal structure of the road, without which there was no prospect of operation.
 
 
 42
 Finally, Coast Line necessarily looked to current earnings for reimbursement. The history of A. & D.-- well known both to the mortgagees and to Coast Line-- starkly revealed the absence of other sources for payment. Moreover, the very origin and character of the account-- its computation on a per car basis and obligation to satisfy monthly the minimum charge of $75,000 each year-- indicate the billing was against current earnings.
 
 
 43
 These same conclusions apply to the cost of maintaining the interlocking plant between the two roads at Boone. This obligation was established between Southern and Coast Line while Southern was lessee ofA. & D. The plant provided A. & D. with juncture to and means of crossing Coast Line's rails. Similarly to be allowed is the cost of maintenance of an interlocking plant at Emporia, Virginia where A. & D. again crosses Coast Line tracks. For this facility there was no formal agreement, but obviously it was indispensable to rail movements over A. & D. However, since the installation of the automatic interlocking plant at Emporia was a capital rather than an operative cost, it cannot be allowed as a preferred claim.
 
 
 44
 As to amounts accruing in the sixmonth period only, we disagree with the District Court and give priority over the mortgage liens to claims of Coast Line both for the trackage and facilities agreement of July 1, 1949 and for maintenance of the interlocks at Boone and Emporia.
 
 
 45
 3. Southern Railway. At its western terminus in Danville A. & D. used the freight facilities house, diesel shop facilities and switching services owned and as operated by Southern Railway. Their arrangement was embodied in a supplemented agreement dated August 1, 1949. A. & D. had no facilities of its own there and no practical means of otherwise providing them. Additionally, in its route from Danville to Portsmouth was a small sector of track between Jeffress and Clarksville owned by the Southern and which formed an integral link perfecting the A. & D. line. Use of this connection was allowed A. & D. by Southern under a January 15, 1953 agreement. Notice of default required by this agreement was effectively embodied in correspondence between the railroads on and before October 28, 1958. We think it clear that for the six-month period, payments required under these agreements were equitable liens rating above the mortgages.
 
 
 46
 A. & D. just could not survive without these facilities. For the same reason we gave precedence to claims of Coast Line under its agreements with A. & D., we give Southern preference here. The accounts under the contracts had been in arrears for a substantial time prior to the six-month period. True, Southern obtained as early as 1958 a security deposit of $10,700, but this sum was only a fraction of the amount owed prior to July 19, 1959. Current payments were credited against past due charges. But Southern would surely not have been required by the Commission to keep the contract subsistent in the face of recurrent defaults by A. & D., particularly in respect to supplies and employee services at Danville. In the circumstances-- as with Coast Line-- it conclusively appears to us that facilities and services provided under both of Southern's contracts looked to current earnings for current rentals and, as a practical matter, there was imperative necessity of payment.
 
 
 47
 We overrule the District Court and allow Southern priority over the mortgages for sums accrued under these contracts during the period from July 19, 1959 to January 19, 1960. We deny priority for the balance of moneys claimed under the agreements.
 
 
 48
 4. Destruction of Cars. An accident on the debtor's line on September 29, 1959 destroyed or badly damaged several cars belonging to other railroads. A. & D. carried insurance covering the loss above the first $15,000. In addition to the insurance, it had the benefit of the car salvage. American Association of Railroads regulations imposed upon a railroad in possession of a foreign car responsibility to the owner for its destruction. This had become a contract liability of A. & D. The obligation has standing comparable to interline traffic debts: no other line would allow its cars to go upon A. & D.'s tracks without assured indemnity in the event of their destruction. We have no hesitancy in saying with the court below that claims for car destruction must be placed above the mortgage liens.
 
 
 49
 All claims so far discussed are intrasystem accounts-- instances of railroad relying upon railroad. This is a circumstance to be noted in ascertaining the business-operating character of the services, their claim on current earnings and the necessity for payment.
 
 
 50
 5. Texaco, Inc. For some time before May, 1959 Texaco had been selling A. & D. locomotive diesel fuel oil; it continued to do so until January 14, 1960. Deliveries were not made under unitary contract but simply as ordered. The unpaid balance as of July 19, 1959 was $3964.03, dating back to May 20, 1959. Oil delivered between July 19, 1959 and January 14, 1960 amounted to $21,671.95, for which an equitable lien is claimed by Texaco under the six months rule.
 
 
 51
 On April 4, 1960 Texaco filed, pursuant to the provisions of 43-24 and 25 of the Code of Virginia of 1950, a memorandum of lien for amounts due within 90 days of the filing of the memorandum. The lien was for the sum of $25,635.98 for oil furnished between May 20, 1959 and January 4, 1960. The statute gives a lien 'on the franchies, gross earnings and on all the real and personal property' of the railroad notwithstanding any earlier mortgage, for supplies furnished on accounts becoming 'due and payable' within 90 days before the filing of the memorandum of lien. Oil actually delivered in the statutory period amounted to $2,099.26.
 
 
 52
 We do not think Texaco has an equitable lien. Prior to May 1959, A. & D. and Texaco went on a modified C.O.D. Basis: thereafter no delivery was made without a simultaneous payment on the old account, which as of July 19, 1959-- the beginning of the six-months period-- was $3964.03, as already noted. Upon each such subsequent delivery a voucher was given that had been drawn and dated (but retained) contemporaneously with the delivery of the oil which appeared as the oldest unpaid item in the old balance. Thus as a practical matter Texaco was not looking to current earnings for payment of current deliveries but rather for payment of the old balance. Hence it was not extending credit against current earnings within the contemplation of the six months rule.
 
 
 53
 But this does not affect the statutory lien, since the preference it gives the general creditor against the corpus of the railroad's assets is unconditional. Therefore, we accord Texaco such a lien in the amount of $2,099.26. Mott v. Wissler Mining Co., 135 F. 679 (4 Cir. 1905); Frick Co. v. Norfolk & O.V.R.R., 86 F. 725 (4 Cir. 1898). The District Court allowed Texaco $6014.90. The added increment results from its erroneous conclusion that not 90 but 120 days was the period covered by the statute, that is the statutory filing time of 90 days plus the 30-day grace period stated on the invoices. For, as we have seen, by arrangement between the parties payment became 'due' for each delivery as received and hence there was no grace period.
 
 
 54
 The orders of the District Court consistent with this opinion are affirmed, so far as inconsistent they are reversed, and the action is remanded to the District Court for entry of orders in conformity herewith.
 
 
 55
 Affirmed in part, reversed in part and remanded for further proceedings.
 
 
 
 [1]
 77 of the Bankruptcy Act, 11 U.S.C.A. 205